## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PATRICIA RIPLEY, *et al.*<br>*Plaintiffs*<br><br><br>*v.*<br><br><br>HOUSING AUTHORITY OF PRINCE<br>GEORGE'S COUNTY, *et al.*<br>*Defendants* | Case No.:  8:16-cv-2699 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY

## INJUNCTION AND DECLARATORY RELIEF

**STATEMENT OF FACTS** ............................................................................................... 2

**STANDARD OF REVIEW** .............................................................................................. 3

**ARGUMENT** ...................................................................................................................... 4

**HAPGC SHOULD BE PERMANENTLY ENJOINED FROM FURTHER
DISCRIMINATION AGAINST PLAINTIFFS BECAUSE OF THE IMMEDIATE
IRREPARABLE HARM TO THEIR FEDERAL CIVIL RIGHTS AND PHYSICAL
SAFETY** ............................................................................................................................... 4

**1)   Plaintiffs Are Likely To Succeed on the Merits of the Case** ......................................... 4

*a)   The Plaintiffs are Persons with Disabilities* ................................................................. 6

*b)   The Plaintiffs are Otherwise Eligible for HAPGC Public Housing* ............................... 7

*c)   HAPGC is a recipient of federal funds, is a public entity, and a housing provider with 4
or more dwelling units.* ...................................................................................................... 7

*d)   The Plaintiffs Have Been Denied Equal Access and Opportunity To HAPGC Public
Housing* ........................................................................................................................... 8

   i)   Plaintiffs Have Requested Wheelchair Accessible Units and Been Denied Wheelchair
   Accessible Units ............................................................................................................. 8

   *A)   Equal Access and Opportunity Includes the Design and Construction of Public
   Housing Units* ............................................................................................................. 9

   *B)   Defendants Have Acknowledged the Need and Committed to Address the
   Accessibility Needs of its Public Housing Residents through Structural Modifications to*

*its Public Housing Program but have Consistently Failed to Perform Those Modifications.* ................................................................................................................ 11

    *C)    The Plaintiffs Requested Accessible Units on Their Applications and HAPGC Refused to Address their Wheelchair Accessibility Needs* ............................................. 13

ii)   Plaintiffs Have Requested Reasonable Accommodations/Modifications and Have Been Denied Reasonable Accommodations/Modifications ............................................. 16

    *A)    Plaintiffs have requested to be transferred to have their units modified to be wheelchair accessible; or to be transferred to wheelchair accessible units.* ................. 17

    *B)    The Requested Modifications are not an undue financial administrative burden or fundamental alteration of HAPGC's public housing program.* ..................................... 19

    *C)    Plaintiffs are Qualified for the Requested Accommodation* .................................... 20

**2)    The Likelihood of Irreparable Harm to Plaintiffs** ....................................................... 21

**3)    The Balance of Equities Favors the Plaintiffs** ............................................................. 27

**4)    The Public Interest is Served By Enjoining Defendants From Further Discriminatory Acts Against the Plaintiffs** ......................................................................... 28

**CONCLUSION** ........................................................................................................................ 29

       This matter comes before the Court as a matter of great importance for the Plaintiffs because of their need for safe accessible housing in Prince George's County.  Plaintiffs, all persons with disabilities, have filed a complaint against the Defendant Housing Authority of Prince George's County (HAPGC),  its Executive Director and public housing Program Manager for ignoring and denying their requests for a wheelchair accessible unit, structural modifications to their units, and other accommodations that would afford the Plaintiffs equal access to HAPGC's public housing program.

## **STATEMENT OF FACTS**

       Plaintiffs are residents of public housing in Prince George's County.  Plaintiffs are all wheelchair users and persons with disabilities. Each Plaintiff has a unique and complex medical history and each requires a wheelchair accessible unit.

The Plaintiffs have requested wheelchair accessible units either on their initial application to HAPGC public housing or during the term of their tenancy.  These requests have been made a number of times throughout their tenancies.  Plaintiffs have also requested modifications to their housing to add features to the units to increase accessibility, and two Plaintiffs have requested to be provided with larger size bedroom units to accommodate their disability related needs.

**Exhibits 1-5**

The Plaintiffs requests were ignored or denied by the Defendants.

The Plaintiffs seek preliminary relief to compel to Defendants to develop a transition plan to create accessible public housing, compliant with Uniform Federal Accessibility Standards (UFAS) for the Plaintiffs and grant modification and accommodation requests of the Plaintiffs to increase their safety and provide full benefits of their tenancy.

## STANDARD OF REVIEW

In deciding whether to grant a preliminary injunction, a court must "[i]n each case…balance the competing claims of injury and must consider the effect on each party of the granting or withholding the requested relief.   In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NDRC, Inc.*, 129 S. Ct. 365, 374-75 (2009).  The court should consider 1) the likelihood of the moving party's success on the merits on the case; 2) the likelihood of irreparable harm to in the absence of preliminary relief; 3) that the balance of equities tips in favor of the moving party; and 4) that an injunction is in the public interest.  *Id.*

The claims of the Plaintiff and the conduct of the Defendants, when cast under this standard supports the granting of a preliminary injunction for the Plaintiffs, in particular because

of the extraordinary public interest in preventing such flagrant violations of the Plaintiffs' civil

rights and the severe irreparable harm each Plaintiff continues to experience.

## ARGUMENT

**HAPGC SHOULD BE PERMANENTLY ENJOINED FROM FURTHER DISCRIMINATION AGAINST PLAINTIFFS BECAUSE OF THE IMMEDIATE IRREPARABLE HARM TO THEIR FEDERAL CIVIL RIGHTS AND PHYSICAL SAFETY**

### 1) Plaintiffs Are Likely To Succeed on the Merits of the Case

The merits of the Plaintiffs' claims are strong.

Plaintiffs are persons with disabilities and have been subjected to discrimination by a

federally funded public housing program in violation of the Rehabilitation Act, 29 U.S.C. § 794,

the Fair Housing Act Amendments, 42 U.S.C.  § 3601 *et seq*, and the Americans with

Disabilities Act, 42 U.S.C. 42 U.S.C. § 12132 [hereinafter "the Acts"]   Specifically, the

Plaintiffs are persons with disabilities who use wheelchairs.  Equal access to federally subsidized

housing for the Plaintiffs includes the availability of housing units that meet Uniform Federal

Accessibility Standards (UFAS) so that they may enjoy the full benefit of their public housing

units. The Acts also require that reasonable modification and accommodations are offered to

persons with disabilities in order to provide them with equal opportunity in Defendants' housing

programs. Plaintiffs seek enforcement of the access and opportunities promised by the Acts.

The Rehabilitation Act, 29 U.S.C. § 794, the Fair Housing Act Amendments, 42 U.S.C.

§ 3601 *et seq*, and the Americans with Disabilities Act, 42 U.S.C. 42 U.S.C. § 12132 [hereinafter

"the Acts"] are all applicable to this case.  The contours of these civil rights statutes for persons

with disabilities are largely the same and require the Defendants to grant persons with disabilities

equal access and opportunity to their housing programs. *See Bragdon v. Abbott,* 524 U.S. 624,

631-32, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998), *Baird ex rel. Baird v. Rose*, 192 F.3d 462

(4th Cir. 1999), *Kuchmas v. Towson University,* 553 F.Supp. 2d 556 (D. Md 2008).

 To prevail on the merits of all their claims, Plaintiffs must demonstrate: a) They are

persons with disabilities within the contemplation of the Acts; b) that they are otherwise

qualified for the program at issue; c) that the program provider is a recipient of federal funds,[1]

housing provider with more than four dwelling units,[2] and a local and state government agency

administering a public housing program;[3] and d) that they have been denied full benefits or equal

access to that program because of their disability.  *See, e.g., Doe v. University of Md. Med. Sys.*

*Corp.,* 50 F.3d 1261, 1265 (4th Cir.1995).

 Generally, the Acts define discrimination similarly and i) prohibit the disparate treatment

of persons with disabilities; *See Cason v. Rochester Housing Authority*, 748 F. Supp. 1002

(W.D.N.Y. 1990) (finding that an independent living requirement was discrimination against

persons with disabilities).  Disparate treatment includes failing to design and construct covered

properties in accordance with applicable accessibility standards. *See Kuchmas v. Towson*

*University,* 553 F.Supp. 2d 556 (D. Md. 2006) (holding that recipients of federal funds have a

continuous and on-going obligation to make their housing programs accessible under Section

504*);* ii) prohibit the denial of reasonable accommodations or modifications to persons with

disabilities; 42 U.S.C. 3604(f)(3), *see also A Helping Hand, LLC v. Baltimore County*, 515 F.3d

356 (4th Cir. 2008); and iii) prohibit HAPGC from taken actions that have a disparate impact on

persons with disabilities. *Texas Department of Housing and Community Development v. The*

---

[1] The receipt of federal funds is only a condition of the Rehabilitation Act.
[2] This is only a requirement of the Fair Housing Act Amendments.
[3] This is only a requirement of the Americans with Disabilities Act.

*Inclusive Communities Project, Inc.*, 576 U.S. __ (2015) (affirming a cause of action for

disparate impact under the Fair Housing Act Amendments).

 The Plaintiffs assert that they are likely to succeed on the merits of their case because a)

the Plaintiffs are persons with disabilities; b) they are otherwise qualified for the housing

programs of HAPGC; c) HAPGC is a public entity, a recipient of federal funds and operates a

program with more than four housing units; and d) HAPGC has discriminated against the

Plaintiffs by i) failing to provide the Plaintiffs accessible units under the Uniform Federal

Accessibility Standards when offering them public housing unit; and ii) failing to respond to

Plaintiffs requests or ignoring their requests for reasonable accommodations.

 a) *The Plaintiffs are Persons with Disabilities*

Plaintiffs are persons with disabilities within contemplation of the Acts.

 The Acts and their implementing regulations define disability as a mental or physical

impairment that substantially limits a major life activity.  29 U.S.C. § 706(7)(A); 42 U.S.C. §

3602(h); 42 U.S.C.  § 12102 ("disability" means with respect to an individual means: (A) a

mental or physical impairment that substantially limits a major life activity; (B) a record of such

impairment; or (C) being regarded as having such an impairment). The definition of disability

was clarified with the Americans with Disabilities Amendments Act, Pub. L. 110-325 2008 and

considers whether an impairment substantially limits a major life activity without regard to

mitigating measures.  *Id.*

 Ms. Ripley is a single above the knee amputee and uses an electric wheelchair for

mobility.  Mr. Phillips is paralyzed below the waist and also uses an electric wheelchair.  Mr.

Watts is a single below the knee amputee who uses prosthetic legs, and also uses a wheelchair.

He uses a wheelchair in his home because of tightness and swelling associated with wearing his

prosthetic legs.  Mr. Galloway is a double above the knee amputee and uses an electric

wheelchair.  Ms. Carson is diagnosed with multiple sclerosis and uses an electrical scooter.

Because of these physical impairments, the Plaintiffs are substantially limited in their

ability to walk, a major life activity.  Plaintiffs are persons with disabilities within the

contemplation of the Acts.

   b)  *The Plaintiffs are Otherwise Eligible for HAPGC Public Housing*

All the Plaintiffs were found eligible for HAPGC's public housing upon their initial

leasing of the unit and must recertify their eligibility on an annual basis.

   c)  *HAPGC is a recipient of federal funds, is a public entity, and a housing provider with*
       *4 or more dwelling units.*

Public housing authorities are locally created bodies authorized for the sole purpose of

receiving and administering federally appropriated money to develop, own, operate, and manage

public housing with their jurisdiction. United States Housing Act of 1937, codified 42 U.S.C.

1437a, *et seq*.  Public housing authorities are considered instrumentalities of local governments

under the Americans with Disabilities Act.  28 C.F.R. § 35.104

HAPGC is the designated public housing authority (PHA) for Prince George's County.

MD. ANN CODE, HOUSING AND COMMUNITY DEVELOPMENT, § 17-604.  It receives federal money

to administer its public housing program in the form of an Annual Contributions Contract (ACC)

from the United States Department of Housing and Urban Development (HUD). 42 U.S.C.

1437g (describing the formula of allocation of federal dollars to public housing authorities).  It

owns and manages at least 392 public housing units.  Additionally, HAPGC is the recipient of

other federally appropriated dollars from HUD, including Community Development Block

Grants (CDBG).

d) *The Plaintiffs Have Been Denied Equal Access and Opportunity To HAPGC Public Housing*

The Plaintiffs have been discriminated against in the course of their tenancies by i) being denied wheelchair accessible units in public housing and thus being denied equal benefit of Defendants' housing programs in violation of Section 504 of the Rehabilitation Act and the Americans with Disabilities Act (ADA); and ii*)* having their reasonable accommodations and modifications requests ignored in violation of the Acts.

i) Plaintiffs Have Requested Wheelchair Accessible Units and Been Denied Wheelchair Accessible Units

Plaintiffs' claim that the Defendants, as recipients of federal financial assistance, have engaged in prohibited disability discrimination by denying the Plaintiffs the equal benefit of the Defendants' public housing program.  Defendants have leased inaccessible public housing units to the Plaintiffs when Plaintiffs had requested accessible units and the Defendants knew of the lack of accessibility and had for years been required to develop accessible housing and had resources to create accessible public housing. Plaintiffs seek relief from the disparate treatment of the Defendants of denying them equal access and opportunity to its public housing program in violation of the Rehabilitation Act and ADA.

The Rehabilitation Act and the ADA provides a private right of action where an individual alleges and proves discrimination based on a handicap. *Barnes v. Gorman,* 536 U.S. 181, 185 (2002), *Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999). *See also* 42 U.S.C § 12133 (referencing remedies available under the Rehabilitation Act).  Plaintiffs seek relief under the Rehabilitation Act by requesting that the Defendants create wheelchair accessible public housing that complies with 24 C.F.R. § 8.3.  Plaintiffs seek as preliminary relief that the

Defendants create a transition plan to develop accessible public housing units of appropriate size for the Plaintiffs.

As recipients of federal financing, Defendants are required to ensure equal access and opportunity to persons with disabilities in their programs.  29 U.S.C. § 794 ("No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 42 U.S.C. § 12132.  *See also* 24 C.F.R. § 8.4 (setting forth, but not limiting, types of discrimination against persons with disabilities prohibited by Section 504).

> A) *Equal Access and Opportunity Includes the Design and Construction of Public Housing Units*

Equal access extends to the design and construction of facilities and recipients of federal funds may not deny meaningful access to persons with disabilities because of the design and construction of particular facilities.  *Id.*  24 C.F.R. § 8.20 *et seq*., PIH Notice 2010-26 (HA) (attached hereto as **Exhibit 6**).  This requirement to provide access in the design and construction of residential dwellings is a continuing and on-going obligation. *Kuchmas v. Towson University,* 553 F.Supp. 2d 556 (D. Md 2008).

In 1986, HUD adopted formal regulations specifying how PHAs were required to ensure that public housing programs are accessible for persons with disabilities.  In particular, PHAs were required to make public housing accessible for persons with disabilities.  24 C.F.R. § 8.20 *et seq*.

To be considered an 'accessible unit,' federally subsidized units must either i) meet the design and construction elements of the Uniform Federal Accessibility Standards (UFAS)

9

developed by the United States Access Board, or ii) be modified to the specifications of a resident's disability related needs. 24 C.F.R. § 8.3. *See* 24 C.F.R. § 8.32(a)("Effective as of July 11, 1988, design, construction, or alteration of buildings in conformance with sections 3-8 of the Uniform Federal Accessibility Standards (UFAS) shall be deemed to comply with the requirements of §§8.21, 8.22, 8.23, and 8.25 with respect to those buildings.")[4]

Even units that predate the finalization of HUD's implementing regulations for Section 504 are required to achieve accessibility and compliance with UFAS standards for its public housing units. 24 C.F.R. § § 8.24 (describing design and construction requirements for already existing federally subsidized housing), 8.25 (describing compliance for already existing public housing units).  For public housing, specifically, PHAs are required to assess the needs of the residents and applicants and develop a transition plan to address the needs of its public housing residents. 24 C.F.R. § 8.25.  In addressing the needs of residents with disabilities, PHAs must address the lack of accessibility in its public housing program.

Similarly, under the implementing regulations of the ADA, a public entity must ensure access to its programs even if its facilities predate the ADA and its implementing regulations.  25 C.F.R. § 35.150.  Such programmatic access in public housing requires accessible public housing units.  *See Id.*

At the very minimum, PHAs are required to modify units on a case-by-case basis until such time the PHA is in full compliance the implementing regulations and UFAS standards. *See generally* **Exhibit 6**.  *See also* 24 C.F.R. § 8.24(b), 8.25(c).  The design and construction requirements under the Rehabilitation Act and the Americans with Disabilities Act are

---

[4] Federal regulations require a minimum of 5% of units in a development or portfolio be UFAS accessible.  *See generally* **Exhibit 6.**

continuous and on-going obligations.  *Kuchmas v. Towson University,* 553 F.Supp. 2d 556 (D.

Md 2008).[5]

> B)  *Defendants Have Acknowledged the Need to Address the Accessibility Needs of its*
>
> *Public Housing Residents through Structural Modifications to its Public Housing*
>
> *Program but have Consistently Failed to Perform Those Modifications.*

Defendants are aware of the lack of accessibility in its public housing program and have

been provided the necessary resources to perform the modernization efforts to create accessible

public housing.  Defendants have simply elected not to perform those modifications to the

detriment of the Plaintiffs.

HAPGC last performed an assessment of the physical accessibility of its public housing

units in 1994.  This assessment noted various aspects of HAPGC's public housing portfolio that

were not compliant with Uniform Federal Accessibility Standards.  **Exhibit 7**.  Additionally, the

lack of physical accessibility in HAPGC's public housing portfolio was identified as an

impediment to Fair Housing that the County was required to address as part of its obligation to

Affirmatively Further Fair Housing.  **Exhibit 8**, pgs. 78 ("HAPGC should update its Section 504

Needs Assessment to determine if it is in compliance with the minimum 5% and 2%

requirements for accessible units.", 115 ("The County's supple of affordable housing that

accessible to persons with disabilities is inadequate."), 118 (stating that HAPGC should ensure

its inventory meets current standards of accessibility), and 123 (identifying HAPGC as the

responsible entity for ensuring HAPGC public housing meets current accessibility standards).

---

[5] This is in contrast to the design and construction requirements of the Fair Housing Act
Amendments, which apply to covered units constructed after March 31, 1991.  The design and
construction requirements of the Rehabilitation Act, UFAS, are a safe harbor under the ADA.

Beginning in at least 2012, and all subsequent years to the present, Prince George's County continued to acknowledge that HAPGC needed to "Carry[] out modifications needed in public housing based on the section 504 Needs Assessment for Public Housing," **Exhibits 9,** pg. 27**; Exhibit 10,** pg. 27**; Exhibit 11,** pg. 27**; Exhibit 12,** pg. pg. 20**; Exhibit 13,** pg. 16, as part of its Annual Planning process as a an entitlement jurisdiction receiving federal funds.

In Prince George's County Fair Housing Action Plan, part of its 5 year consolidated plan process required by the HUD, HAPGC was designated as the responsible entity for ensuring that public housing meets the accessibility needs of residents and applicants and that the requirements of the 1994 Assessment were in fact completed.  **Exhibit 14**.  HAPGC and its authorized agents are required to annual certify the United States Department of Housing and Urban Development (HUD) that the activities of HAPGC are consistent with the County's Consolidated Plan.

HAPGC has multiple funding sources to perform alterations and modifications to public housing to ensure program accessibility. For FY 2016, HAPGC had $868, 276 in CDBG money designated for Capital Improvements.  **Exhibit 15,** at pg. 19.  For FY 2017, HAPGC had $794,194 in CDBG money designated for Capital Improvements. **Exhibit 16,** at pg. 20  This was in addition to almost $400,000 received from HUD to perform capital maintenance on its public housing programs. For FY2017, HAPGC has budgeted at least $100,000 for the rehabilitation of units into UFAS units, and **Exhibit 16,** at pg. 58 (HUD Form-50075., pg 2 of 4) and has at least another $200,000 in its annual capital fund to address the capital needs of its public housing program.  Additionally, HAPGC has received Community Development Block Grant (CDBG) to assist in modifications of its public housing units. In its notice on accessibility in housing programs, HUD has directed that:  "Modernization activities covered by statutory civil rights

requirements such as Section 504, the ABA, the FHA and the ADA take precedence over non-emergency modernization activities." **Exhibit 6**, at pg. 21.

### C) *The Plaintiffs Requested Accessible Units on Their Applications and HAPGC Refused to Address their Wheelchair Accessibility Needs*

On their original application or during their tenancies with the Housing Authority of Prince George's County (HAPGC) Plaintiffs have requested wheelchair accessible units. **Exhibits 17-21**. The Housing Authority has discriminated against the Plaintiffs by failing to address their accessibility housing needs. The Housing Authority made no effort at the time of the Plaintiffs original requests for accessible public housing to either create accessible public housing or offer the Plaintiffs equally alternative accommodations.  Instead, the Defendants have leased inaccessible units to the Plaintiffs with the full knowledge that the Plaintiffs required wheelchair accessible unit.

Ms. Ripley first applied for public housing in 1988 and requested a wheelchair accessible unit.  She was transferred to her current unit 1992 because she requested a wheelchair accessible unit on her application.  Her current unit is not wheelchair accessible.  For example, Ms. Ripley's unit does not have grab bars, the location or the length required by the UFAS standards. Additionally, there is a lack of clear floor space beside her toilet which she can safely transfer from. Also, many of the light switches and other features of her apartment are outside of her ability to reach. **Exhibits 22, 23.**

Mr.  Phillips first moved into his current unit on or about September 2013 after requesting to be transferred to a wheelchair accessible unit.  His current unit is not wheelchair accessible.  Grab bars for his toilet are inappropriately placed and his bathroom lacks clear floor space.  The shelves and cabinets under his bathroom sink prohibit him from using his lavatory.

13

Also, a lip on his 'roll-in' shower prohibits Mr. Phillips from 'rolling-into' his shower stall. His kitchen is similarly problematic and he has burned himself while attempting to cook on his stove because the control elements for his stove are on the rear and his kitchen sink does not have space beneath the sink that he can roll under to. **Exhibits 24, 25.**

Mr. Watts requested a wheelchair accessible unit on his public housing application and moved into his current unit in November 2013. Mr. Watts was first offered an inaccessible studio apartment. Mr. Watts then requested at least a one bedroom unit because his dialysis machine, HAPGC offered him a fully accessible one bedroom unit. However, Mr. Watts current unit lacks basic accessibility features. Mr. Watts faces physical difficulty in using his bathroom because of the lack of grab bars in his unit and a lip at his roll-in shower. Mr. Watts must use his sink and wall to support himself to pull himself up off the toilet. Additionally, he is limited in his ability to use his shower because of the lip that obstructs his ability to roll-in. Instead, he must pull himself up and grab onto the shower curtain rod for stability in order to transfer to his shower bench. **Exhibit 26, 27**

Mr. Galloway moved into his current unit in 2015 after his second leg was amputated and a friend requested he be transferred to a wheelchair accessible unit. Mr. Galloway's unit is not an accessible unit. Mr. Galloway also cannot use his bathroom. There are no grab-bars in his bathroom and there is not clear floor space for him to park his wheel-chair and transfer to his toilet. There is no bench in his shower, so he cannot use his roll-in shower. He cannot use his lavatory because there are shelves and cabinets beneath the sink. **Exhibit 28, 29.**

Ms. Carson first requested a wheelchair accessible unit when she applied for public housing in 2010. Ms. Carson was never offered a wheelchair accessible unit by HAPGC. Ms. Carson has no means to transfer to her toilet independently. There are no grab bars. There is no

clear floor space.  A third party must physically lift her from her chair and place her on her commode.  **Exhibit 30.**  HAPGC acknowledges that Ms. Carson does not reside in a wheelchair accessible unit, but has made no effort to transfer her to an accessible unit or modify her unit. **Exhibit 31**.

Defendants were made aware of the needs of the Plaintiffs but have failed to afford the Plaintiffs an opportunity to reside in accessible public housing. *See* **Exhibits 18 – 22**.  The Defendants continue to deny Plaintiffs accessible housing opportunities.

Federal law does not permit HAPGC to ignore the need of its residents and decline to make its accessible to persons with disabilities.  24 C.F.R. § 8.25(c).  If a PHA does not have accessible public housing units and there is a need for accessible public housing, a PHA cannot opt-out of addressing the lack of accessibility in its public housing program.

Indeed, HAPGC has regularly committed itself to addressing the lack of physical accessibility in its public housing program in public reporting requirements to the federal government. However, those reports are little more than parchment promises and the Plaintiffs have been harmed by HAPGC's failure to address the very real lack of accessibility in its public housing program.

Plaintiffs apprised Defendants of their housing needs and Defendants declined to create accessible housing or offer any equally effective alternative. The Defendants have consistently represented to the federal government and other stake holders that they would address the lack of accessibility in its public housing program. However, they have consistently failed to make any modifications to address the lack of accessibility in its public housing program.

Such conduct violates the letter and spirit of program accessibility and design and construction requirements of the Rehabilitation Act and its implementing regulations.

Plaintiffs seek a preliminary order to compel the Defendants to create accessible housing units for the Plaintiffs to transfer to or to make modifications to the Plaintiffs' current units to have the units comply with 24 C.F.R. § 8.3.

ii)    Plaintiffs Have Requested Reasonable Accommodations/Modifications and Have Been Denied Reasonable Accommodations/Modifications

Under the Acts, housing providers are required to provide reasonable accommodation and modifications.  Generally, a reasonable accommodation is a change in practice policy or procedure to ensure equal access to otherwise qualified persons with disabilities; *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir. 1997), *Kuchmas v. Towson University,* 553 F.Supp. 2d 556 (D. Md. 2008); a reasonable modification is a structural change to the design and construction to ensure equal access and opportunity to a person with disability.[6]  Because HAPGC provided federally funded public housing, it must provide both reasonable accommodations and modifications at no cost to its tenants under the same standard.  *See Hovsons v. Township of Brick*, 89 F.3d 1096 (3rd Cir. 1996) (holding that reasonable accommodations are the same standard under Rehabilitation Act and Fair Housing Act Amendments claims).  *See also Kuchmas v. Towson University,* 553 F.Supp. 2d 556 (D. Md. 2006).

To prevail on a reasonable accommodation claim, Plaintiffs must demonstrate A) that they made a request for reasonable accommodation; B) that the accommodation is not an undue

---

[6] The Rehabilitation Act and Americans with Disabilities Act, make no distinction between reasonable accommodations and reasonable modifications.   That distinction is a feature of the Fair Housing Act Amendments.  Because the Rehabilitation Act and ADA are also applicable in this case, the standard for reasonable accommodation/modification is the same.

financial *and* administrative burden, or fundamental alteration of the program; and C) that they are qualified for an accommodation.

> A) *Plaintiffs have requested to be transferred to have their units modified to be wheelchair accessible; or to be transferred to wheelchair accessible units.*

Plaintiffs seek, as a reasonable accommodation to be transferred to a unit that is accessible; to have their current units brought into compliance with relevant accessibility standards; and to have modifications to their current units to address immediate accessibility needs make their unit more accessible, and safer for their use until they are transferred to UFAS accessible units.

Plaintiffs have made requests for a UFAS accessible unit.  **Exhibits 1 – 5**.

In the instance of Ms. Ripley, there was no response.

In the instance of Mr. Watts, there was no response.

In the instance of Mr. Galloway, there was no response.

In the instance of Mr. Phillips, Defendants first left Mr. Phillips a reasonable accommodation request form to be completed.  They were advised that Mr. Phillips request for an accessible unit was clear from his letter.  Finally, when HAPGC did respond to a written request, HAPGC asserted, without any knowledge or basis, that Mr. Phillips had an "oversized electric wheel-chair," and that there was no unit that would be accessible to Mr. Phillips, nor was it possible to transfer him to an accessible unit.  **Exhibit 33**.  However, in April, 2016, HAPGC offered to transfer Mr. Phillips to another unit.  Mr. Phillips advised he would only transfer if the unit was accessible.  When he inspected the unit he observed several features of the unit that made it inaccessible.  This ranged from inconvenient, such as switches and lights being out of

Mr. Phillip's reach, to the dangerous, such as the lack of grab bars and lack of wall space to appropriately install grab bars.

Between September 15, 2015 and the offer of another inaccessible unit, Mr. Phillips was prescribed a hospital bed to alleviate swelling in his legs.  The bed takes up considerable space and is in addition to a regular bed Mr. Phillips keeps.  Mr. Phillips usually only uses the hospital bed during day time hours to alleviate swelling.  He cannot transfer to this bed independently and has the assistance of a day attendant to help him transfer to the hospital bed.  When apprised of Mr. Phillips' need for a two bedroom accessible unit, HAPGC was unable to offer him a two bedroom accessible unit. HUD regulations and guidance specifically permit the granting of an extra bedroom as a reasonable accommodation to a disability when there is significant medical equipment.

In the instance of Ms. Carson, Ms. Carson first requested an accessible unit beginning with her original application.  **Exhibit 21**.  When informed that this was not possible, Ms. Carson requested that she be provided a roll-in shower. Ms. Carson had requested a roll-in shower since the beginning her residency at HAPGC public housing. Only after Ms. Caron attended an HAPGC Board of Commissioners meeting and raised the issue directly with the Chairman of the Board, did HAPGC respond.  HAPGC sent staff to review her unit. *See* **Exhibit 26.**  However, HAPGC reviewed whether the unit could be made *fully* accessible and denied her request as being cost prohibitive. Additionally, HAPGC staff recommended that Ms. Carson be transferred to a wheelchair accessible unit.  There has been no follow-up from HAPGC staff regarding transferring Ms. Carson to a wheelchair accessible unit.

Additionally, the Plaintiffs Galloway, Phillips, Watts, and Carson have requested modifications to their units to make those units more suitable for use by the residents until they

can move to a fully accessible unit. Plaintiffs, Galloway, Phillips, and Watts, have each requested interim modifications to their units, such as grab bars, removal of cabinets under the sink. **EXHIBITS 1, 2, 4 and 26.** These requests for modifications have been ignored or denied.

Failing to respond to reasonable accommodation requests is tantamount to a denial of a request. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 271-72 (4th Cir. 2013). *See also*, *Astralis Condo. Ass'n v. Sec'y U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 69 (1st Cir. 2010) (rejecting the defendant's argument that "it should not be held responsible because it never expressly refused to accommodate the complainants," where the defendant had not responded to the plaintiff's request for a reasonable accommodation.).

Here, given that the Defendants have created a specific policy to address reasonable accommodation requests and the Plaintiffs were known by the Defendants to have a need for wheelchair accessible units.  The Defendants failure to respond can be construed as nothing less than a clear signal that they will not provide the Plaintiffs with their requested accommodations.

> B) *The Requested Modifications are not an undue financial administrative burden or fundamental alteration of HAPGC's public housing program*.

As described in part 1.d.i, UFAS units are to be created by public housing authorities as a condition of their receipt of federal funds.  HAPGC has had an affirmative obligation over the past 30 years to create accessible units and ensure that those units are occupied by residents who need the features of the unit. 24 C.F.R. § 8.27.

Plaintiffs have requested that HAPGC make their units UFAS accessible through modifications to their units, or to transfer them to units that have been UFAS retro-fitted. Transfers to accessible public housing units and modifications to public housing units to create accessibility in public housing was specifically identified by federal regulation as methods for

ensuring accessibility for persons with disabilities.  These requests from the Plaintiffs are imminently reasonable.

As stated above, HAPGC has had ample funds to perform alterations and modifications to public housing to create accessibility in it public housing program for the Plaintiffs.  These resources include over $200,000 in federal money designated specifically for capital funds to HAPGC public housing and another $868,276 in grants from HUD that HAPGC has designated for capital improvements.  As explained by HUD in its guidance to PHAs, "Modernization activities by statutory civil rights requirements such as Section 504, the ABA, the FHA and the ADA take precedence over non-emergency modernization activities."  **Exhibit 6,** pg. 21.

HAPGC has sustained a practice of not addressing long-standing accessibility issues.  Its current budget and funding availability do not indicate that this was taken from a position of financial hardship, but reflect a significant indifference to the housing needs of its disabled public housing tenants.

The Plaintiffs request for UFAS accessible units is imminently reasonable in the face of strong federal regulations that require PHAs to create accessible public housing so as not to deny persons with disabilities equal access and opportunity to use public housing.

C) *Plaintiffs are Qualified for the Requested Accommodation*

As stated part 1.a., the Plaintiffs are all wheelchair users who need the features of wheelchair accessible units.

Failure to provide reasonable accommodations, such as transfers, or modifications, in these circumstances is discrimination within the contemplation of the Acts. *See generally* **Exhibit 6.**  *See also,* 24 U.S.C. § 794 and implementing regulation 24 C.F.R. 8; 42 U.S.C. § 3604(f)(3)(B); and 42 U.S.C. § 12131(2).  The fact that the Defendants have a written reasonable

accommodation policy and routinely do not follow that policy, demonstrates a willful indifference to the housing needs of the Plaintiffs.

The Plaintiffs claim against the Defendants for failure to provide reasonable accommodations is strong and likely to succeed.

**2)  The Likelihood of Irreparable Harm to Plaintiffs**

Plaintiffs have suffered irreparable harm and continue to face the prospect of irreparable harm from the Defendants refusal to provide wheel-chair accessible units; and provide reasonable accommodation and modifications.

Each Plaintiff individually faces daily struggles to utilize basic amenities in their dwellings.  Most significantly, the absence of accessibility compromises the ability of Plaintiffs to utilize their bathrooms and puts their bodies at physical risk.  This potential for irreparable bodily harm to Plaintiffs because of fall or other accident because of a lack of physical accessible is high.  It has occurred to Mr. Phillips and Ms. Ripley, especially when transferring to perform such basic hygiene, like toileting. The risk to the Plaintiffs for physical harm will continue to be extraordinarily high until the accessibility of their environment is increased.

<u>Patricia Ripley</u>

Plaintiff Patricia Ripley can only enter her bathroom by guiding her chair at an angle into the wall, because the toilet obstructs a clear pathway into the bathroom. **Exhibit 23.** This has caused damage to the wall because Ms. Ripley must maneuver her chair in such a way that it scraps the wall of her apartment each time she wants to enter he bathroom.  *Id.* Additionally, because of the lack of adequate turning radius she must transfer to her toilet from outside of her bathroom by grasping onto inappropriately placed grab bars and pulling herself around the doorframe onto her toilet.  *Id.*

The lack of accessibility in Ms. Ripley's bathroom puts her body at physical risk and is a source of extreme disruption and embarrassment. *Id.* Her ability to complete activities of daily living, such a toileting and showering is seriously impaired. *Id.* Performing routine aspects of life rise to extraordinary ordeals because of the lack of accessibility in her unit. *Id.* Ms. Ripley continues to struggle daily to perform basic activities of daily living. *Id.*

<u>Andre Phillips</u>

Plaintiff Andre Phillips' can only roll forward into his bathroom. **Exhibit 25**. He cannot rotate his chair and cannot transfer to the toilet in his unit because of the lack of clear floor space. *Id.* Instead, like Ms. Ripley, he must pull himself around the doorframe onto the toilet. *Id.* He has fallen multiple times while attempting to transfer to his toilet, most recently in January. *Id.* Additionally, he has cut himself while transferring from his wheel-chair onto the toilet. *Id.* Further, he cannot use his shower because of the lack of adequate turning radius that would permit him to transfer himself onto a shower bench and because of a lip at his shower that prohibits him from either rolling into the shower or approaching it closer. *Id.*

Mr. Phillips cannot use appliances in his kitchen, like his stove or refrigerator. *Id.* For example, the controls for the elements of his stove are on the back of the stove, requiring Mr. Phillips to reach over the elements to turn them off or on. *Id.* These inaccessible features of Mr. Phillips' apartment impacts his ability to perform personal hygiene and his personal safety. *Id.*

Mr. Phillips has recently been prescribed a hospital bed and has a daily attendant to assist him with activities of daily living. *Id.* While Mr. Phillips' resides in a one bedroom apartment, he has two beds, his regular bed and a hospital bed. *Id.* Because of the amount of medical equipment in his apartment, Mr. Phillips space to maneuver has become even further circumscribed in his housing unit. *Id.*

Mr. Phillips has been unable to use and enjoy his unit and must put himself at bodily risk to use basic amenities such as using the restroom and using the stove-top. *Id.* In addition to being a source of frustration, anger, and humiliation, the lack of accessibility is a source of physical pain as Mr. Phillips must pull his half paralyzed body around a door frame just to toilet and has burned himself on his stove-top while cooking for himself. *Id.* Mr. Phillips has fallen on numerous occasions because of the difficulty accessing his bathroom. *Id.* Mr. Phillips has been told that he complains a lot by HAPGC staff. Mr. Phillips legitimate requests for physical accessibility have been dismissed by HAPGC staff and ignored. *Id.* Mr. Phillips continues to perform dangerous maneuvers and activities in his wheel-chair in order to use the basic elements of his unit, including the bathroom. *Id.*

<u>Alonzo Watts</u>

Plaintiff Alonzo Watts has resided in public housing since 2012. **Exhibit 27**. Mr. Watts is a double-leg amputee and has diabetes. HAPGC first offered Mr. Watts a studio apartment that was neither wheelchair accessible nor had enough space for his in home dialysis machine. Mr. Watts was in the process of obtaining prosthetics and requested a unit that could accommodate his use of wheelchair. HAPGC represented that it would offer him to a fully accessible unit.

In response to developing sores and tightness of his prosthetics brought about by long periods of standing, Mr. Watts current usual practice is to use his wheel-chair in his home. However, the unit lacks basic elements of accessibility, such as appropriately placed grab bars in the bathroom. Mr. Watts must grab onto nearby items not intended to support his weight when he transfers to the toilet, including a towel rack, the wall, and his bathroom sink. Mr. Watts cannot rotate his wheel-chair in the bathroom because of the lack of sufficient turning radius. He can only transfer to the toilet by bracing himself against the wall and placing his full weight

on his sink in order to lift himself from his chair onto the toilet.  Similarly, Mr. Watts cannot

access his shower.  A concrete 'lip' at the threshold of his 'roll-in' shower prevents him from

rolling into the shower.  He must put his weight on a shower chair and transfer to it in order to

use his shower.

Because of the lack of physical accessibility in his bathroom, Mr. Watts places himself in

physical danger daily because of the lack of grab bars in his restroom.  Mr.Watts is fearful of

falling and not being able to receive help.  He places his body at risk daily by using items in his

restroom not intended to support his weight.  Mr. Watts continues to use his wheelchair on a

daily basis and transfer himself from his chair to the toilet without the benefit of grab-bars in his

unit.

<u>Kenneth Galloway</u>

Plaintiff Kenneth Galloway's unit lacks clear floor space and appropriately placed grab

bars in his bathroom to facilitate a safe transfer to use his toilet, Mr. Galloway must toilet in a

bedside commode and then dispose of the contents into his toilet. **Exhibit 29**. Additionally,

because of the lack of accessibility in his shower from the absence of a shower bench and

appropriate grab bars, Mr. Galloway bathes at his kitchen sink, or with a sponge in his bed.

The lack of accessibility is a source of humiliation and embarrassment for Mr. Galloway.

He experiences feelings of helplessness because he cannot use the basic elements of his unit,

such as the restroom.  When he uses a bedside commode to toilet and a sponge to bath, Mr.

Galloway feels unable to care for himself and depressed.  Additionally, Mr. Galloway must use

the community room to perform personal maintenance such as shaving and brushing his teeth

because he cannot see in his mirror or approach his bathroom sink.  Mr. Galloway does not use

his bathroom for either toileting or showering out of fear of harming himself because of the lack

of accessibility in his bathroom.  This is source of embarrassment, humiliation, and depression for Mr. Galloway.

Gail Carson

Plaintiff Gail Carson first moved into public housing from a nursing home in 2011. Ms.  Carson can drive her scooter forward into her bathroom. **Exhibit 30**.  She is unable to direct her scooter in any other direction.  She can only face the wall opposite of entrance into the bathroom.  Additionally, there are no grab bars or other assistive elements in her bathroom to assist her in transferring from her chair.  Because of the lack of accessibility features in her bathroom, Ms. Carson depends on the assistance of a second person to physically lift her up from her chair when they are in the bathroom.  This second person must stand in the bathtub and physically lift Ms. Carson up and place her on the toilet

This is a source of anxiety, despair, physical pain, and discomfort for Ms. Carson. While her doctors have suggested she get an electric wheel-chair, she has been hesitant to get one because of the lack of space in her apartment.  Ms. Carson can only safely utilize the bathroom in her unit when a second person is there to assist her.  Further, being lifted by a second person while they stand is a tub causes anxiety about her safety and causes her physical discomfort.

In sum, Plaintiffs' daily lives are significantly and irreparably impacted by the lack of physical accessibility in their public housing dwelling units.  Ms. Ripley is denied an opportunity to have a live-in aide.  Mr. Phillips' already difficult and constrained living conditions are further circumscribed by the presence of a hospital bed in his living room and he continues to struggle to transfer to his toilet.  Mr. Watts continues to place his weight precariously against the wall and his bathroom sink in order to transfer. Mr. Galloway uses a bedside commode and cannot use his

. Ms. Carson places her physical safety literally in the arms of another party. The likelihood of irreparable harm in their cases are great.

They have requested to be transferred to UFAS accessible units and be provided interim modifications equivalent or provided other accommodations that would ensure equal access and opportunity to Defendant's public housing programs.  Further, Plaintiffs request that Defendants comply with the terms of its own administrative policies in processing their present reasonable accommodation request and any future reasonable accommodation request from the Plaintiffs.

Further, preliminary injunctive relief is a remedy available when monetary damages would not adequately compensate and where a party demonstrates a likelihood of success on the merits. Irreparable harm may be presumed by courts when violations of civil rights laws are implicated. *Pathways Psycho Support Ctr., Inc. v. Town of Leonardtown,* 223 F. Supp. 2d. 699, (D. Md 2002). *Accord Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417 (11th Cir. 1984) ("irreparable injury may be presumed from the fact discrimination and violation of fair housing statutes."); *Connecticut Hosp. v. City of New London,* 129 F. Supp. 2d 123, 128-29 (D. Conn. 2001); *Laflamme v.  New Horizons, Inc.* 514 F. Supp. 2d 250, 257 (D. Conn. 2007)*; Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165 (M.D. Ala. 2011) (vacated as moot based on considerations of equity).   The presumption of irreparable harm in civil rights cases such as this exist in part because recognition that the dignity and social harm caused by discriminatory housing practices cannot be adequately measured in terms of mere monetary compensation.  As described in *Laflamme*, discriminatory practices impermissible interfere with dignity rights.

Additionally, the FHA statute itself permit "any permanent or temporary injunction…." 42 U.S.C. 3613(c)(1) as relief available under the statute.  *Burlington N.R.R. Co. v. Dep't of Revenue,* 934 F.2d 1064, 1074 (9th Cir. 1991) ("The standard requirements for equitable relief

need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief").

Here, no monetary relief will adequately address the Plaintiffs' lack of accessibility in public housing and the continued threats to bodily safety or the refusal of HAPGC to engage in an interactive process to address the Plaintiffs' disability related housing needs.

### 3) The Balance of Equities Favors the Plaintiffs

Defendants' conduct flouts the law and their own policies and procedures.

Defendants have ignored the Plaintiffs requests for accessible units.  Defendants have declined to address the lack of accessibility in public housing, despite repeatedly acknowledging the problem it poses for people with disabilities in its public housing program and in the jurisdiction they serve.  As described above, each of these actions on their own would constitute a significant violation of the Plaintiffs' rights.

Taken together, however, this conduct betrays a substantial disregard for the housing needs of persons with disabilities Defendants' Public Housing program.

On the other hand, Plaintiffs are requesting, at the bare minimum, that the Defendants engage in an interactive process to ensure access to the public housing program to arrive at appropriate accommodations for the Plaintiffs.  *See Jankowski Lee v. Cisneros*, 91 F.3d 891 (7th Cir. 1996)

However, Defendants refuse to even respond or acknowledge the Plaintiffs requests. Plaintiffs continue to struggle and their lives continue to be seriously curtailed because of the actions by the Defendants in this case and the refusal of the Defendants to make efforts for equal access and opportunity for the Plaintiffs.

Further, given that the Defendants have long acknowledged the lack of accessibility in its Public Housing program, **Exhibits 7-14**, delaying Plaintiffs access to public housing would only reward the conduct of the Defendants in declining to perform their obligations under the Acts. Additionally, requiring the Defendants to perform the retro-fit and to modify five dwelling units as Defendants have discussed doing for a number of years in order to comply with its own strategic goals is not prejudicial to the Defendants.

Given that the Defendants have long been aware of the lack of accessibility in their public housing programs and have done nothing in the past twenty (20) years to resolve the matter, it would only reward the Defendants neglectful and dismissive attitude toward the housing needs of the Plaintiffs and other persons with disabilities residing in public housing to permit them to continue without providing immediate relief to the Plaintiffs.

4) **The Public Interest is Served By Enjoining Defendants From Further Discriminatory Acts Against the Plaintiffs**

Federal civil rights statutes, in particular fair housing statutes, are broadly remedial and are intended to undo long-standing discrimination and segregation of the classes protected by their provisions.

Enjoining HAPGC from engaging in practices that ignore the law, impair the dignity of persons with disabilities, and presents serious physical and emotional harms to the Plaintiffs, is in the public interest.

The Defendants have long acknowledged the civil rights problems with its public housing program.  Yet, they have refused to pursue just resolution of those matters.  Instead, the Defendants permit these problems to go unaddressed and allow the physical and emotional

suffering of the Plaintiffs, and probably other people with disabilities, to continue without even so much as an acknowledgement.

An order enjoining further discrimination against the Plaintiffs by i) requiring HAPGC to develop a plan to create accessible units of appropriate size for the Plaintiffs; and ii) requiring HAPGC to make modifications to units that will increase the safety and accessibility of the units of the Plaintiffs' units.

In the face of such an overwhelming public policy commitment to non-discrimination in federally subsidized public housing, and the Defendants clear disregard for those public policy commitments, no legitimate counter-vailing interest exists for the Defendants.

## **CONCLUSION**

Plaintiffs seek the extraordinary relief of a preliminary injunction for HAPGC's violations of the Rehabilitation Act, the Fair Housing Act Amendments, and the Americans with Disabilities Act.

While a preliminary injunction may be an extraordinary form of relief, the Defendants extraordinary indifference to the law and the suffering of the Plaintiffs warrant the granting of a preliminary injunction.

The Plaintiffs are likely to succeed on the merits of their claims. The Plaintiffs have been consistent in their requests for wheelchair accessible units. *Supra* Part I.d.i. The Defendants have repeatedly acknowledged the lack of accessibility in its public housing program and has repeatedly publically committed to addressing the need of persons with disabilities by carrying out those modifications necessary to make public housing accessible. *Id.* at I.d.i.B. When Plaintiffs identified themselves as being in need of wheelchair accessible units on multiple occasion, the Defendants have simply elected to ignore these requests. Meanwhile, Plaintiffs

continue to face daily threats to their physical well-being and to their emotional state in continuing to face the daily indignity of having to struggle to simply perform daily activities despite their ability to do so but for the lack of accessibility in their units.  Further, the Plaintiffs must endure the insult of having requests ignored.

Plaintiffs surely endure extraordinary circumstances, and in such circumstances, extraordinary relief is wholly appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through their attorney David A. Prater and Disability Rights Maryland, respectfully request the Court:

1) Adjudge and declare that Defendants have violated Section 504 of the Rehabilitation Act, 29 USC 794; the Fair Housing Act as amended, 42 U.S.C  3604 *et seq*, and Title II of the Americans with Disabilities Act, 42 U.S.C. 12132, and their implementing regulations

2) Enjoin the Defendants from further discrimination against the Plaintiffs;

3) Enjoin the Defendants to:

   a)  Develop UFAS units for the Plaintiffs to transfer to; and

   b)  Make modifications to Plaintiffs units to increase accessibility.

4) Compel the Defendants to timely respond to reasonable accommodation and modification requests consistent with Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Fair Housing Act Amendment, and all applicable law;

5) Grant any other relief the Court may deem appropriate.

Respectfully Submitted,


/s/
_____

David A. Prater
Federal Bar Number: 30223
*Attorney for Plaintiffs*
Maryland Disability Law Center
1500 Union Ave.
Suite 2000
Baltimore, MD 21211
davidp@mdlclaw.org
p: 410-727-6352, ext. 2500
f: 410-727-6389