# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

PATRICIA RIPLEY
1100 OWENS RD.
APT. 102
OXON HILL, MD 20745

ANDRE PHILLIPS
4142 BUNKER HILL RD.
APT. 109
COTTAGE CITY, MD 20722

ALONZO WATTS
1100 OWENS RD.
APT. 402
OXON HILL, MD 20745

KENNETH GALLOWAY
4142 BUNKER HILL RD.
APT. 104
COTTAGE CITY, MD 20722

GAIL CARSON
5641 SARGENT RD.
HYATTSVILLE, MD 20782

SHEILA SMITH
4142 BUNKER HILL RD.
APT. 208
COTTAGE CITY, MD 20722

JACQUELINE WHITE
4142 BUNKER HILL RD.
APT 412
COTTAGE CITY, MD 20722

LEKEISHA ELLISON
4512 POPPE PL.
TEMPLE HILLS, MD 20748

REGINA LEE
5425 COLUMBIA RD.
APT. 414

Civil Action No. 8:16-cv-2699

JURY DEMANDED

1

COLUMBIA, MD 21044

DOMINIC RADCLIFF
6154 SPRINGHILL TERR.
APT. 202
GREENBELT, MD 20770
*and*

DISABILITY RIGHTS MARYLAND
1500 UNION AVE.
SUITE 2000
BALTIMORE, 21211

*Plaintiffs*

*v.*

THE HOUSING AUTHORITY
OF PRINCE GEORGE'S COUNTY
(HAPGC)
9200 BASIL CT.
SUITE 500
LARGO, MD 20774

ERIC C. BROWN, IN HIS OFFICIAL
CAPACITY AS
EXECUTIVE DIRECTOR AND IN HIS
INDIVIDUAL CAPACITY,
HOUSING AUTHORITY OF PRINCE
GEORGE'S COUNTY
9200 BASIL CT.
SUITE 500
LARGO, MD 20774

ALVIN COLEY, IN HIS OFFICIAL
CAPACITY AS PROGRAM MANAGER
FOR PUBLIC HOUSING IN PRINCE
GEORGE'S COUNTY AND HIS
INDIVIDUAL CAPACITY,
HOUSING AUTHORITY OF PRINCE
GEORGE'S COUNTY
9200 BASIL CT.
SUITE 500
LARGO, MD 20774

MICHELLE CRITTENDEN, IN HER
OFFICIAL CAPACITY AS PROGRAM

MANAGER FOR THE HOUSING CHOICE
VOUCHER PROGRAM FOR THE
HOUSING AUTHORITY OF PRINCE
GEORGE'S COUNTY,
HOUSING AUTHORITY OF PRINCE
GEORGE'S COUNTY
9200 BASIL CT.
SUITE 500
LARGO, MD 20774
*Defendants.*

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF,

## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DAMAGES

Plaintiffs bring this action by and through their attorneys David A. Prater, Lauren Young, and

Disability Rights Maryland and allege the following:

### Introduction

1.      This lawsuit is being filed to stop the Defendants' unlawful practices of discriminating

against persons with disabilities in the administration and operation of HAPGC housing

programs; and for declaratory and equitable relief and damages.

2.      The Defendants administer two federally funded affordable housing programs in Prince

George's County – public housing and the housing choice voucher program (HCV Program).

3.      These programs offer affordable housing to qualifying low-income persons. While

administered locally, these housing programs are federally funded programs and subject to the

provisions of the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act, 42

U.S.C. § 12132, and the Fair Housing Act and its Amendments, 42 U.S.C. § 3601, *et seq*.

4.      Through the acts and omission set forth in this Amended Complaint, the Defendants have

denied the Individual Plaintiffs equal access and benefits to the housing programs they

Case 8:16-cv-03899-TDC   Document 20-2   Filed 12/16/16   Page 4 of 53

administer.  Plaintiff Disability Rights Maryland brings claims on behalf of its constituents, persons with disabilities, harmed by the policies and practices of the Defendants.

5.      These acts and omissions of the Defendants reflect more than mere neglect or indifference to the rights and safety of the Individual Plaintiffs. These practices evidence a widespread practice of discrimination against persons with disabilities. The Defendants' actions and chronic refusal to address the housing needs of persons with disabilities necessitates this action to seek the intervention of the Court to enforce the Plaintiffs' legal rights.

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343.  Claims for Declaratory Relief are authorized by 28 U.S.C. §§ 2201-02.

## VENUE

7.      Venue in this District is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

### Plaintiffs

8.      Plaintiff Ms. Patricia Ripley is a single adult tenant of public housing at 1100 Owens Rd. Apt. 102, Oxon Hill, MD 20745, residing under a lease with the Housing Authority of Prince George's County. Ms. Ripley has an above-the-knee amputation and uses a wheelchair for mobility.  She is a qualified person with a disability under the law and is otherwise eligible for public housing.  She has been discriminated against by the Defendants HAPGC, Brown, and Coley as set forth in this Amended Complaint

9.      Plaintiff Mr. Andre Phillips is a single adult tenant of public housing at 4142 Bunker Hill Rd., Apt. 109, Cottage City, MD 20722 under a lease with the Housing Authority of Prince George's County.   Mr. Phillips is paralyzed below the waist and uses a wheelchair for mobility.

He is a qualified person with a disability under the law and is otherwise eligible for public

housing.  He has been discriminated against by the Defendants HAPGC, Brown, and Coley as set

forth in this Amended Complaint.

10.     Plaintiff Mr. Alonzo Watts is an adult tenant residing at 1100 Owens Rd., Apt. 402, Oxon

Hill, MD 20745, under a lease with the Housing Authority of Prince George's County.  Mr.

Watts is a single below the knee amputee who alternates between the use of a wheelchair and

prosthetic legs.  Mr. Watts is a qualified person with a disability under the law and otherwise

eligible to reside in public housing.  He has been discriminated against by the Defendants

HAPGC, Brown, and Coley as set forth in this Amended Complaint.

11.     Plaintiff Mr. Kenneth Galloway is a single adult tenant of public housing in at 4142

Bunker Hill Rd., Apt. 104, Cottage City, MD 20722, under a lease with the Housing Authority of

Prince George's County.  Mr. Galloway is a double-above-the-knee amputee.  He uses a

wheelchair for mobility.  Mr. Galloway is a qualified person with a disability under the law and

is otherwise eligible for public housing.  He has been discriminated against by the Defendants

HAPGC, Brown, and Coley as set forth in this Amended Complaint.

12.     Plaintiff Ms. Gail Carson is a single adult tenant of public housing in Prince George's

County at 5641 Sargent Ave., Hyattsville, MD 20782, under a lease with the Housing Authority

of Prince George's County.  Ms. Carson has a physical impairment that requires her use of a

motorized scooter to assist with her mobility.  She is a qualified person with a disability under

the law and is otherwise eligible for public housing. She has been discriminated against by the

Defendants HAPGC, Brown, and Coley as set forth in this Amended Complaint.

13.     Plaintiff Ms. Sheila Smith is a single adult tenant of public housing in Prince George's

County residing at 4142 Bunker Hill Rd., Apt 208, Cottage City, MD 20722, under a lease with

Case 8:16-cv-02699-TDC   Document 20-2   Filed 12/16/16   Page 6 of 53

the Housing Authority of Prince George's County.  Ms. Smith has mental and physical disabilities.  She has a mental impairment that substantially limits her ability to work.  She needs the assistance of mobility devices to ambulate.  She uses two canes and has been prescribed an electric wheelchair to assist her in mobility.  She is a qualified person with a disability under the law and is otherwise eligible for public housing. She has been discriminated against by the Defendants HAPGC, Brown, and Coley as set forth in this Amended Complaint.

14.     Plaintiff Ms. Jacqueline White is a single adult tenant of public housing in Prince George's County residing at 4142 Bunker Hill Rd., Apt. 412, Cottage City, MD 20722, under a lease with the Housing Authority of Prince George's County.  Ms. White is deaf.  She is a qualified person with a disability under the law and is eligible for public housing.  She has been discriminated against by the Defendants HAPGC, Brown, and Coley as set forth in this Amended Complaint.

15.     Plaintiff Ms. LeKeisha Ellison is the head of a family of three, a former resident of HAPGC public housing, and a current participant in HAPGC's HCV Program.  Ms. Ellison has a physical disability that substantially limits her ability to walk. Ms. Ellison requires a housing unit with no or minimal steps.  She is a person with a disability under the law and is eligible for HAPGC's public housing and HCV programs.  She has been discriminated against by the Defendants HAPGC, Brown, Coley, and Crittenden as set forth in this Amended Complaint.

16.     Plaintiff Ms. Regina Lee is a participant in HAPGC's HCV program.  Ms. Lee has a physical impairment that substantially limits her ability to walk, and she uses a wheelchair for mobility.  She is a person with a disability under the law and is eligible for HAPGC's HCV Program.  She has been discriminated against by the Defendants HAPGC, Brown, and Crittenden as set forth in this Amended Complaint.

17.     Plaintiff Mr. Dominic Radcliff is a participant in HAPGC's HCV Program and a former resident of HAPGC's public housing.  Mr. Radcliff has a physical disability that limits his joint ability and ability to walk. He uses a wheelchair and currently has an aide to assist him in performing activities of daily living.  He is a person with a disability and is eligible for HAPGC's public housing and HCV Programs.  He has been discriminated against by the Defendants HAPGC, Brown, Coley, and Crittenden, as set forth in this Amended Complaint.

18.     Plaintiffs Ripley, Phillips, Watts, Galloway, Carson, Smith, White, Ellison, Lee, and Radcliff are hereinafter referred to collectively as "Individual Plaintiffs."

19.     Plaintiff Disability Rights Maryland is the federally mandated Protection and Advocacy organization for the state of Maryland.  The Protection and Advocacy System was established by Congress to protect the rights of persons with disabilities in each state.  42 U.S.C. §§ 15041, 10801, and 29 U.S.C. § 794e.

20.     Congress has mandated that each state must have an organization responsible for advancing the civil and human rights of persons with disabilities.  Disability Rights Maryland ("DRM") is that organization for the state of Maryland.

21.     The individuals on whose behalf DRM stands would otherwise have standing to sue in their own right.  The individuals whose housing rights DRM seeks to protect are individuals with disabilities, and DRM's action in this matter is germane to its purpose and mission.  DRM serves constituents statewide, including in Prince George's County.

22.     DRM is controlled by a Board of individuals who represent the needs of clients served by DRM and includes individuals who have received or are receiving services based upon their disabilities. As required by federal law, the Board includes significant representation of individuals with disabilities.

Case 8:16-cv-03689-TDC   Document 20-2   Filed 12/16/16   Page 8 of 53

23.     DRM seeks input from its constituents in setting its priorities and activities, including individuals with, and family members of, people with disabilities.  Protecting the housing rights of people with disabilities is one of DRM's identified priority areas. DRM has established access to housing as a priority area for several years and has provided legal services related to the housing rights of hundreds of individuals and families with disabilities.  DRM has also engaged in systemic litigation and advocacy to protect the disability-related housing rights of individuals and families.

24.     DRM has a grievance process to ensure it operates for its clients.

### Defendants

25.     Defendant the Housing Authority of Prince George's County (HAPGC) is the public housing authority for Prince George's County created by MD. ANN. CODE, HOUS. AND COMM. DEVELOP., § 17-604 and owns, operates, and manages all public housing in Prince George's County pursuant to 42 U.S.C. § 1437 *et seq*, including the properties and units in which the Plaintiffs reside.  HAPGC also administers a HCV Program pursuant to 42 U.S.C. § 1437f. Defendant's primary source of funding is the United States government, specifically the Department of Housing and Urban Development (HUD).

26.     Defendant Eric C. Brown is the Executive Director of HAPGC.  He has the authority and ultimate responsibility to oversee the day-to-day operations of HAPGC and to ensure that the agency and its employees do not discriminate against low-income applicants and residents with disabilities in the management and operations of HAPGC's housing programs.  He is sued in his individual and official capacities.

27.     Defendant Alvin Coley is the Program Manager for Public Housing at the HAPGC.  He is responsible for managing the day-to-day affairs of public housing operations at HAPGC and for

ensuring that public housing employees do not discriminate against low-income applicants and residents with disabilities in the management and operation of public housing. He is sued in his individual and official capacities.

28.     Defendant Michelle Crittenden is the Program Manager for the HCV Program at HAPGC.  She is responsible for managing the day-to-day affairs of the HCV Program operations at HAPGC and ensuring that HCV Program employees and staff do not discriminate against low-income applicants and residents with disabilities in the management and operation of the HCV Program.  She is sued in her official capacity.

## LEGAL FRAMEWORK

### Affordable Housing Programs Administered by the Defendants

29.     Public housing and the HCV Program are federally funded affordable housing programs authorized by the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437 *et seq.* Although public housing and the HCV Program are federally created programs, they are administered by local and state agencies called public housing authorities (PHA) to appropriately address the housing needs of a specific jurisdiction.

30.     The two programs offer distinct benefits with the goal of providing affordable housing to qualifying low-income persons.  Under the public housing program, 42 U.S.C. § 1437, PHAs develop, own, and operate dwelling units subject to eligibility and other requirements prescribed by the statute and federal regulations.  When a PHA owns dwelling units, the PHA is required to have accessible units and make reasonable structural modifications to ensure its housing program is accessible for residents with disabilities who need accessible housing to enjoy the full benefits of their tenancy.

31.     Under the HCV Program, 42 U.S.C. § 1437f(o), PHAs issue and administer individual vouchers to families that the families then use to rent privately owned dwelling units.  The PHA agrees to pay a portion of the rent that will make the unit affordable for the family, and the family pays the remainder in rent and other costs, as applicable.

32.     The administration of both of these programs are covered by federal civil rights laws that require equal access and opportunity in these programs to persons with disabilities.  These laws are the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, and the Fair Housing Act Amendments of 1988 (collectively "the Acts").

33.     Generally, the Acts define discrimination similarly and i) prohibit the disparate treatment of persons with disabilities; *see Cason v. Rochester Housing Authority*, 748 F. Supp. 1002 (W.D.N.Y. 1990) (finding that an independent living requirement was discrimination against persons with disabilities).  Disparate treatment includes failing to design and construct covered properties in accordance with applicable accessibility standards.  *See Kuchmas v. Towson Univ.*, 553 F. Supp. 2d 556 (D. Md. 2008) (holding that recipients of federal funds have a continuous and ongoing obligation to make their housing programs accessible under Section 504); ii) prohibit the denial of reasonable accommodations or modifications to persons with disabilities; *see* 42 U.S.C. § 3604(f)(3), *see also A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356 (4th Cir. 2008); and iii) prohibit HAPGC from taking actions that have a disparate impact on persons with disabilities, *Texas Dept. of Housing & Community Affairs v. The Inclusive Communities Project, Inc.*, 576 U.S. __(2015) (affirming a cause of action for disparate impact under the Fair Housing Act Amendments).  Further, the Acts require covered entities under these Acts to modify policies, practices, and procedures where necessary to ensure persons with

disabilities enjoy equal opportunity and benefits of Defendants' housing programs similar to the opportunities and benefits afford to persons without disabilities.

34.     Additionally, under the Fair Housing Act Amendments, Defendants have an obligation to affirmatively further fair housing by removing barriers, physical and otherwise, that would impede persons with disabilities' access to housing.

35.     Defendants have affirmative obligations under these Acts to take steps that increase housing choice for persons with disabilities, protect persons with disabilities from discrimination in its own housing programs, provide reasonable accommodations, and require modifications to HAPGC's housing programs to ensure those programs ensure an equal benefit to persons with disabilities participating in those programs.

**Rehabilitation Act of 1973**

36.     The purpose of the Rehabilitation Act of 1973 is to "maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" of people with disabilities. 29 U. S.C. § 701(b)(1). The Rehabilitation Act is based on findings that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as...housing" and that "the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to...achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency." 29 U.S.C. §701(a)(5) and (6)(B).

37.     All entities receiving federal financial assistance must comply with the anti-discrimination provisions of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a). "No otherwise qualified individual with a disability...shall, solely by reason of his or her disability, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794.

38.    Section 504 requires covered entities to provide people with disabilities meaningful access to programs, services, and activities. *Alexander v. Choate*, 469 U.S. 287 (1985). The meaningful access requirement applies across the board to all of a covered entity's programs, services, and activities, regardless of whether a particular program, service, or activity itself has direct federal funding.

39.    U.S. Department of Housing and Urban Development ("HUD") Regulations implementing Section 504 provide that "[a] recipient, in providing any housing, aid, benefit, or service in a program or activity that receives Federal financial assistance from the Department [of Housing andUrban Development] may not, directly or through contractual, licensing, or other arrangements, solely on the basis of handicap: … (ii) Afford a qualified individual with handicaps with any housing, aid, benefit, or service that is not equal to that afforded to other;" and "(iii) Provide a qualified individual with handicaps with any housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;" and "(iv) Provide different or separate housing aid, benefit, or services to individuals with handicaps or to any class of individuals with handicaps from that provided to others unless such action is necessary to provide qualified individuals with handicaps with housing, aid, benefit, or service to beneficiaries in the recipient'ss federally assisted program or activity."  24 C.F.R. § 8.4(b)(1).

40.    The HUD regulations implementing Section 504 also require that "[i]n any program or activity receiving financial assistance from the Department, a recipient may not, directly or

through contractual or other arrangements, utilize criteria or methods of administration the purpose or effect of which would: (ii) Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap involved in the program or activity, unless the recipient can demonstrate that the criteria or methods of administration are manifestly related to the accomplishment of an objective of a program or activity; or (iii) Perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State." 24 C.F.R. § 8.4(b)(4).

41.     In addition to general provisions program requirements that prohibit disparate treatment of persons with disabilities, HUD also requires that PHAs modify their housing programs, when necessary to ensure people with disabilities have equal access to and opportunity in their housing programs.  These modifications can be either structural, or modifications in policies and practices.  PHAs must consider modifications to their housing programs to ensure that people with disabilities are able to have meaningful access to those programs.

42.     HUD Section 504 regulations also describe the specific architectural and other requirements that apply to public housing projects or units receiving federal financial assistance when making modifications. 24 C.F.R. § 8.25.

43.     For example, five percent of the total dwelling units in public housing projects receiving federal financial assistance must meet the requirements set forth in the Uniform Federal Accessibility Standards ("UFAS") for accessibility for people with mobility impairments, and an additional two percent must be accessible per UFAS requirements for people with hearing or vision impairments. 24 C.F.R. § 8.32 (describing the design and construction standard that satisfies the definition of "accessible" in 24 C.F.R. § 8.3).

44.     Public housing projects must take steps to ensure that accessible dwelling units in those projects are occupied by people who need the accessibility features of those units, including offering available units first to people who need the accessibility features and taking steps to ensure that advertising and other information regarding the availability of accessible units reaches people with disabilities. 24 C.F.R. § 8.27.

45.     Accessible units must also be distributed throughout housing projects and sites to the maximum extent feasible and be available in a range of sizes and amenities so that the choice of living arrangements for a person with a disability is comparable to that of others.

46.     HUD has also promulgated regulations and guidance specific to the HCV Program.

47.     Under those regulations PHAs must take affirmative steps to ensure that a voucher program is accessible for persons with disabilities, especially for participants who require accessible units.

48.     Specifically, PHAs are required to take the following actions: "encouragement of participation by owners having accessible units," 24 C.F.R. § 8.28(2); "[w]hen issuing a Housing Voucher to a family which includes an individual with handicaps include a current listing of available accessible units known to the PHA and, if necessary, otherwise assist the family in locating an accessible dwelling unit; "take into consideration special problems with locating accessible units when considering requests for extensions of voucher terms; and "approve a family request for an exception rent under 982.504(b)(2)."[1]

---

[1] On July 29, 2016, President Obama signed the Housing Opportunities through Modernization Act (HOTMA), Pub. L. 114-201, 130 Stat. 782, into law.  Among other provisions, HOTMA permits PHAs to approve rent exceptions of up to 120% of the Fair Market Rent without approval from HUD.

49.     The affirmative obligations prescribed by law and regulation under the Rehabilitation Act for the HCVP are such that PHAs have an obligation to ensure that persons with disabilities have a meaningful opportunity to locate accessible housing.

50.     The regulations underscore that steps must be taken to ensure that people with physical disabilities have meaningful access to Defendants' housing program.

**Title II of the Americans with Disabilities Act**

51.     The Americans with Disabilities Act (ADA), which is modeled on Section 504 of the Rehabilitation Act, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" with "clear, strong, consistent, enforceable standards...in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b).

52.     All public entities, including state and local governments and their departments, agencies, and instrumentalities, must comply with Title II of the ADA.

53.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

54.     Like Section 504, Title II of the ADA requires covered entities to provide people with disabilities meaningful access to programs, services, and activities. The meaningful access requirement applies to all of a covered entity's programs, services, and activities, regardless of whether a particular program, service, or activity itself has direct federal funding.

55.     U.S. Department of Justice Regulations implementing Title II of the ADA clarify that "[a] public entity, in providing any aid, benefit or service, may not, directly or through

contractual, licensing or other arrangements, on the basis of disability .... (ii) Afford a qualified individual with a disability with an opportunity to participate or benefit from the aid, benefit, or service that is not equal to that afforded to other;" and "(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;" and "(iv) Provide different or separate aids, benefits, or services to individuals with a disability or to any class of individuals with disabilities from that provided to others unless such action is necessary to provide qualified individuals with handicaps with aids, benefits, or services to beneficiaries in the recipients federally assisted program or activity." 28 C.F.R. § 35.130(b)(1).

56      Department of Justice Regulations implementing Title II also clarify that: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

57.     Similar to Section 504 under the ADA, state and local entities are required to evaluate their facilities, programs, and methods of administration, and develop a transition plan that addresses any barriers, physical or otherwise, that would impede access by persons with disabilities.  28 C.F.R. § 35.150

58.     To the extent a state OR local entity has complied with UFAS under Section 504, such compliance is considered a safe harbor under the ADA.  However, if the entity has not complied with the UFAS under Section 504, the entity must consider the methods of compliance set forth in 28 C.F.R. § 35.150(b).

## The Fair Housing Act and Amendments

59.     In 1988, Congress amended the Fair Housing Act to include a number of provisions

prohibiting discrimination on the basis of disability, as part of a comprehensive revision of the

law. In considering those amendments, Congress stressed that enforcement of civil rights laws is

necessary to protect people with disabilities from the "devastating" impact of housing

discrimination, including both architectural and attitudinal barriers to full participation by people

with disabilities.

60.     The debates and legislative history of the Fair Housing Amendments Act of 1988 reflect

Congressional findings that a person using a wheelchair or other mobility aid is just as

effectively excluded from the opportunity to live in a particular dwelling by steps or thresholds at

building or unit entrances and by too narrow doorways as by a posted sign saying "No

Handicapped People Allowed."[2]

61.     The Fair Housing Act prohibits intentional discrimination on the basis of disability and

many neutral policies and practices that have a disproportionate adverse impact on people with

disabilities. 42 U.S.C. §§ 3604(f)(l) and 3604(f)(2).

62.     Additionally, like the Rehabilitation Act and the ADA, the Fair Housing Act requires a

housing provider to change its policies, practices, and procedures when necessary to afford a

person with a disability equal access and opportunity to a housing program.  42 U.S.C. §

3604(f)(3)(B).

---

[2] The Fair Housing Amendments Act ("FHAA") uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing  Amendments Act of 1988"). Except when referring to the statutory language of the FHAA, this Complaint uses the term "disability"

63.     The Fair Housing Act also goes a step further by requiring recipients of funding from

HUD to affirmatively further fair housing.  This requires that recipients of HUD funding,

including PHAs to identify barriers, whether those barriers are architectural, attitudinal, or

otherwise, and take affirmative steps to overcome those barriers that impede persons with

disabilities from access to housing of their choice.

## FACTUAL ALLEGATIONS

### Defendant HAPGC Owns, Operates, Manages, and Administers Federally Subsidized Housing Programs That Are Required To Provide Equal Opportunity and Be Accessible for Persons with Disabilities

64.     HAPGC owns and operates approximately 392 units of public housing and administers

approximately 6,000 vouchers.

65.     HUD requires that HAPGC and its employees manage and operate public housing in a

non-discriminatory manner and make its housing programs accessible to people with disabilities.

24 C.F.R. § 8.1 *et seq*. This non-discrimination requirement extends to administration of the

HAPGC's public housing program as well as to the physical design and construction of

HAPGC's public housing properties.  *See* 24 C.F.R. § 8.25 (describing the design and

construction requirements for existing public housing programs).

66.     Even for those units pre-dating the promulgation of HUD regulations, PHAs are required

to develop a needs assessment of their properties and develop a transition plan to describe how a

PHA will create accessibility in its public housing program.  24 C.F.R. § 8.25.

67.     HAPGC last analyzed its compliance with UFAS standards in 1994.  The 1994

assessment by HAPGC documented several significant deficiencies in HAPGC's public housing

portfolio.   These deficiencies included the lack of clear floor space in the bathrooms of units

HAPGC identified as being accessible, and lack of accessibility in common areas of HAPGC's public housing.

68.     However, HAPGC failed to develop a transition plan to address the barriers that existed in its public housing portfolio.

69.     The lack of accessibility in HAPGC's public housing properties was identified as an impediment to fair housing by Prince George's County.

70.      In developing annual and strategic plans, PHAs are required to describe how they will address impediments and barriers to housing choice for persons with disabilities.

71.     Since at least 2012, HAPGC has identified the need to "[c]arry[] out modifications needed in public housing based on the section 504 Needs Assessment for Public Housing" as a priority need for addressing the housing needs of persons with disabilities.

72.     HAPGC's failure to provide accessible units for persons with hearing and visual impairments was acknowledged in the County's most recent consolidated plan.

73.     Despite this public acknowledgement about the need to address the accessible design and construction of the public housing portfolio, Defendants HAPGC, Brown, and Coley have made minimal effort to address the lack of physical accessibility in its public housing program, despite long being aware of the need for wheelchair-accessible housing and HAPGC's legal obligation to address the lack of accessible units in its public housing portfolio.[3]

74.     Despite public acknowledgements contained in their Annual Reports to HUD about the lack of wheelchair-accessible public housing, Defendant Eric C. Brown, has certified annually to

---

[3] Since the filing of the Plaintiffs' Original Complaint, ECF Doc. 1 and Motion for Preliminary Injunctive Relief, ECF Doc. 7, Defendants have altered a number of units in an effort to address the lack of wheelchair accessibility in its public housing program.

the federal government that HAPGC is in compliance with federal civil rights laws regarding equal access and opportunity for persons with disabilities.

75.     Recently, HAPGC staff under the supervision of Defendants Brown and Coley, installed a gazebo in the rear of a public housing property located at 1100 Owens Road.  This gazebo was in the common use area of the residence of Plaintiffs Ripley and Watts but is not wheelchair accessible.[4]

76.     The housing units in which the Individual Plaintiffs and others with disabilities reside do not meet their disability-related needs with significant consequences to the Individuals as described further herein.

77.      Defendants HAPGC, Brown, and Coley have denied equal use and opportunity to HAPGC public housing residents with disabilities who need accessible housing and accessible features to their units.  Defendants' have a sustained practice of refusing to make structural modifications to units when necessary to ensure equal access and opportunity to persons who require wheelchair-accessible units.  They have done so with the full knowledge of the need of the Individual Plaintiffs and the general need for more accessible housing for their consumers with disabilities.

78.     In its most recent Annual Report, HAPGC reported that 50% of applicants on its public housing waiting-list are persons with disabilities.

**Defendants Offer Public Housing Residents and Applicants Who Require Accessible Units**

**a Benefit that is Not Equal to the Benefit of Wheelchair-Accessible Public Housing**

---

[4] Since the filing of the Plaintiffs' Original Complaint, ECF Doc. 1 and Motion for Preliminary Injunctive Relief, ECF Doc. 7, Defendants have applied for a permit to install a ramp at the gazebo.

79.     Because Defendants HAPGC, Brown, and Coley do not have accessible public housing as required by federal statute and regulations, it is the policy of all Defendants to refer public housing applicants and tenants who require accessible housing to its HCV Program.

80.     The HCV Program and public housing programs are distinct programs with separate waiting lists, obligations, and requirements.

81.     By diverting applicants to and residents of public housing who require wheelchair-accessible units to a HCV Program that offers a facially different benefit, the Defendants deny otherwise eligible persons an opportunity to participate in HAPGC's public housing program and further delay compliance with HUD regulations.

82.     As described, *supra* paras. 29-30, the HCV Program offers a far different benefit than that offered by public housing and is on its face a benefit that is not equal to the benefit of public housing.

83.     While a public housing portfolio is required to have a ready supply of wheelchair-accessible units of varying bedroom sizes that provide ample space and appropriate features for families with members who have mobility disabilities, a voucher participant under the HCV Program requires families to locate their own housing and requires that the market for voucher holders have an accessible unit available.

84.     Additionally, by referring public housing residents and applicants to the HCV Program, the Defendants are imposing costs on individuals with disabilities that they do not have in the public housing program and would not face incurring but for the Defendants' failures to comply with required architectural accessibility standards or modifications.

85.     For example, security deposits in public housing are set at affordable levels for the low-income tenants who occupy these units.  In Prince George's County, the security for public

housing is set at $200 or one month of the tenant portion of rent, whichever is greater. On the other hand, participants in HAPGC's voucher program may be required to pay up to two months' full market rent as a security deposit, depending on a private landlord's requirements.

86.     Further, while the utility expenses in HAPGC public housing are covered by HAPGC, under the HCV Program, a tenant's responsibility for utilities depends on the landlord, and a tenant may have to put forward a security deposit just to be able to initiate utilities – an obligation under the HCV program.

87.     Also, applicants and tenants lose substantial legal rights by moving from the public housing program into the HCV Program.  In public housing, tenants do not have to cover the cost of reasonable modifications to their units needed because a public housing property would be subject to Section 504 of the Rehabilitation Act.  In the HCV Program, however, the tenant must cover any modification costs for modifications like grab-bars, wider doorways, or a ramp or curb-cut.

88.     A tenancy subsidized by a voucher on the private market can be ended after the conclusion of a lease without any reason, whereas public housing tenancies cannot be terminated except for cause, providing significantly greater housing security to program beneficiaries.

89.     The Individual Plaintiffs who are participants in HAPGC's voucher program are either former residents of Prince George's County Public Housing who requested accessible public housing units or applicants to HAPGC public housing who rejected a unit because of the lack of accessibility.  None of the Individual Plaintiffs was offered an accessible unit despite their obvious needs and requests for such housing.[5]

---

[5] After the filing of the original Complaint and Motion for Preliminary Injunctive Relief, Defendants were able to offer Ms. Galloway a unit that adequately addressed his disability related needs.  HAPGC was unable to offer an accessible unit to any of the other Individual Plaintiffs.

90.     In referring public housing residents and applicants with disabilities to the voucher

program without supplemental assistance to cover the significant programmatic differences

between public housing and HCV Program, the Defendants have discriminated against the

Individual Plaintiffs by offering them a housing benefit that is unequal to the benefit they would

have received in public housing.

91.     The HCV Program is *prima facie* unequal to the benefit of public housing.  To compound

the problem, Defendants HAPGC, Brown, and Crittenden administer the HCV Program in such a

way that persons with disabilities are further denied a meaningful opportunity to use the program

to find accessible housing and housing with accessibility features.

**Defendants HAPGC, Brown, and Crittenden Have Failed to Take Affirmative Steps That**

**Would Make its Housing Choice Voucher Program Accessible to Persons with Disabilities**

92.     Defendants HAPGC, Brown and Crittenden failed to take the affirmative steps required

by federal regulations that would make its Housing Choice Voucher Program accessible for

persons with disabilities.

93.     Defendants HAPGC, Brown and Crittenden do not advise HCVP applicants or

participants of their ability to request reasonable accommodations, such as rent increases,

extensions of time, a listing of accessible properties, or search assistance with locating an

accessible housing unit.

94.     Defendants HAPGC, Brown and Crittenden have not provided an accurate listing of

accessible units that accept HAPGC-administered vouchers and fail to provide what limited

information they do have to HCV participants who require accessible units.

95.     Defendants HAPGC, Brown and Crittenden do not have an adequate inventory of

accessible housing units to which it can refer applicants and participants with disabilities because

it has failed to perform adequate outreach to landlords in Prince George's County and does not adequately coordinate with the County government to address the housing needs of its residents.

96.     Defendants HAPGC, Brown and Crittenden routinely ignore requests for exception rents by voucher participants to rent accessible units.

97.     Defendants HAPGC, Brown, and Crittenden have implemented a preference system that gives higher priority to individuals and families that work 30 or more hours a week in Prince George's County over the disabled or elderly.[6]

98.     Defendants HAPGC, Brown and Crittenden have not appointed a 504/ADA Coordinator to assist in addressing the disability-related needs of voucher participants or applicants.

99.     In addition to failing to comply with applicable federal regulations regarding the administration of the HCV Program to ensure that persons with disabilities who use vouchers are able to rent an accessible housing units with accessibility features, Defendants do not take the recommended affirmative steps that would permit persons with disabilities using vouchers to address barriers that impede their ability to use their voucher to have accessible housing.

100.    Defendants HAPGC, Brown and Crittenden do not use administrative process to permit for the use of exception rents in order for landlords to modify units to create accessible features.

101.    Defendants HAPGC, Brown and Crittenden do not use administrative fees from the federal government to pay for modifications in voucher program.

102.    The Defendants HAPGC, Brown and Crittenden have not worked with the County to use other sources of federal funds such as HOME, CDBG or tax credits to identify accessible housing that would be available to participants in the Defendants' HCV Program.

---

[6] HUD regulations at 24 C.F.R. 982.207(b)(2) for the HCV Program require that a preference for families that work 30 or more hours a week must be co-equal with a preference for the disabled or elderly.

103.     The Defendants has not used their capacity to project base vouchers in existing accessible units operated by private landlords.[7]

104.     Such changes in the administration and operation of the Defendants' HCV Program are established by regulation and guidance from HUD.  The modifications in the Defendants' administration of its HCV Program set forth in *supra* paras, 99-103, are clearly within the ability of a PHA's authority and would increase the availability of accessible units for voucher holders who need accessibility features.

105.     These affirmative steps have been omitted by the Defendants despite their knowledge that persons with disabilities struggled to locate accessible housing when participating in the Defendants' HCV Program.

106.     Because of the acts and omission by the Defendants in the administration and operation of their housing programs, the Individual Plaintiffs are denied an opportunity to reside in accessible housing.

**Plaintiffs Are Persons with Disabilities and Have Requested Accessible Units**

Facts in Common among the Plaintiffs

107.     Individual Plaintiffs are persons with disabilities and participants in HAPGC's housing programs.

108.     Individual Plaintiffs residing in public housing have all requested accessibility features in their units to accommodate their use of wheelchairs.

109.     Individual Plaintiffs residing in public housing have made verbal and written requests for reasonable accommodations to HAPGC staff, employees, and agents.

---

[7] Project based voucher provide long-term subsidizes to specific units under the HCV regulations and guidelines.  24 C.F.R. § 983.

110.    Individual Plaintiffs Ellison, Lee, and Radcliff, who are all currently voucher participants, applied for public housing and/or requested accommodations.  They were offered vouchers, but have been unable to rent accessible units in Prince George's County.

111.    Individual Plaintiffs have all made numerous reasonable accommodation requests to the Defendants without success.

112.    Plaintiffs have been denied the opportunity to use and enjoy HAPGC housing programs because of the policies and practices of the Defendants. Plaintiffs struggle daily to use basic amenities in their apartments, including bathrooms and kitchens. The lack of physical accessibility significantly impacts the Plaintiffs' quality of life in public housing and their right to enjoyment of their tenancies.

113.    All of the Plaintiffs have suffered other acts of discrimination based on disability by the Defendants as set forth herein.

<u>Tricia Ripley</u>

114.    Plaintiff Patricia Ripley is a single above-the-knee amputee. Ms. Ripley uses a wheelchair for mobility and requires an accessible unit. When Ms. Ripley first applied to HAPGC public housing in 1988, she requested a wheelchair-accessible unit. She renewed this request as recently as January 7, 2016 and later revised it to include her need for a live-in aide.

115.    Ms. Ripley does not currently reside in a wheelchair-accessible unit.  The lack of accessible features includes, but is not limited to, that her bathroom lacks the required clear floor space and correctly placed grab bars at the toilet and shower under the UFAS.

116.    The lack of required clear floor space and appropriately placed grab bars severely impacts Ms. Ripley's ability to use and enjoy her dwelling unit.  She can only enter her bathroom by guiding her chair at an angle into the wall, because the toilet obstructs a clear pathway into

the bathroom.  This has caused damage to the wall because Ms. Ripley must maneuver her chair in such a way so that her chair scraps the wall of her apartment. Additionally, because of the lack of adequate turning radius she must transfer to her toilet from outside of her bathroom by grasping onto inappropriately placed grab bars and her sink and pulling herself around the doorframe onto her toilet. Many of the light switches and other features of her apartment are outside of her ability to reach

117.    HAPGC's unwillingness to provide Ms. Ripley a wheelchair-accessible unit is a source of disappointment, disruption, and physical pain for Ms. Ripley.  The lack of accessibility in Ms. Ripley's apartment puts her body at physical risk and is a source of extreme disruption and embarrassment.  Her ability to complete activities of daily living, such as toileting and showering is seriously compromised.  Performing routine aspects of life rise to extraordinary ordeals because of the lack of accessibility in her unit.  Ms. Ripley continues to struggle daily to perform basic activities of daily living. Since the filing of the original complaint and Plaintiffs' Motion for Preliminary Injunctive relief, Defendants made modifications to Ms. Ripley's unit that provide features that allow Ms. Ripley to use her unit without fear of falling and injury.

118.    On January 7, 2016, by and through her attorney, Ms. Ripley requested to be transferred to a UFAS-accessible unit.  On April 8, 2016, Ms. Ripley amended her request to be transferred to a two-bedroom wheelchair-accessible unit because of her need for a live-in aide. HAPGC ignored both of her requests and did not reply to either request.

119.    HAPGC only responded to Ms. Ripley's request for a two-bedroom wheelchair-accessible unit and a live-in aide after the filing of the original complaint and Plaintiffs' Motion for Preliminary Injunctive Relief.

27

120.    Additionally, HAPGC recently installed a gazebo at the public housing property in which

Ms. Ripley resides. Ms. Ripley is denied any opportunity to use this gazebo because it does not

have any degree of wheelchair accessibility. Defendants HAPGC, Brown, and Coley are aware

of the lack of physical accessibility to this gazebo.  However, Defendants HAPGC, Brown, and

Coley only applied for a ramp to be installed at the gazebo after the filing of the Original

Complaint and Plaintiffs' Motion for Preliminary Injunctive Relief.

<u>Andre Phillips</u>

121.    Plaintiff Andre Phillips is totally paralyzed below the waist.  He has resided in HAPGC

public housing since 2011.  Mr. Phillips uses an electric wheelchair for mobility.  When Mr.

Phillips began using an electric wheelchair, he requested to transfer to a wheelchair-accessible

unit. He was transferred to his current unit on or about August or September 2013 by Defendant

Alvin Coley.

122.    Mr. Phillips' current unit is not accessible. Similar to the bathroom in Ms. Ripley's unit,

there is not the required clear floor space and correctly placed grab bars in his apartment.   The

shelves and cabinets under his bathroom sink prohibit him from using his lavatory. Since the

filing of the original complaint and Plaintiffs' Motion for Preliminary Injunctive Relief,

Defendants have installed kitchen appliances that Mr. Phillips can more easily use.

123.    The inaccessibility of Mr. Phillips' unit impairs Mr. Phillips' ability to use his unit.  Mr.

Phillips can only roll forward into his bathroom.  He cannot rotate his chair and cannot transfer

to the toilet in his unit because of the lack of clear floor space.  Instead, like Ms. Ripley, he must

pull himself around the doorframe onto the toilet.  Additionally, he cannot use his shower

because of the lack of adequate turning space that would allow him to transfer into the shower.

Instead, he can only receive sponge baths from a day attendant to maintain his personal hygiene.

He has cut himself on his own wheelchair attempting to transfer to his toilet. Mr. Phillips has burned himself while attempting to cook on the stove-top, but since the filing of the original Complaint and Plaintiffs' Motion for Preliminary Injunctive Relief the Defendants have installed kitchen appliances that are more accessible for Mr. Phillips. These inaccessible features of Mr. Phillips' apartment impact his personal hygiene and his personal safety.

124.     In September 2015, Mr. Phillips requested to be transferred to a UFAS-accessible unit within HAPGC's public housing portfolio; to receive a voucher, or to have his unit modified to UFAS standards in an effort to obtain an accessible unit.

125.     Mr. Phillips was offered a voucher by HAPGC, but was concerned about his ability to locate an accessible unit.

126.     On April 6, 2016, Mr. Phillips was told by the onsite property manager that he would be transferred the following day. Mr. Phillips advised that he would not transfer until he could review the unit for accessibility. Between his request for a transfer to a UFAS accessible unit and HAPGC advising him that he would be transferred the following day, Mr. Phillips had been prescribed a hospital bed. When apprised of Mr. Phillips' need for a two-bedroom accessible unit, HAPGC was unable to offer him a two-bedroom accessible unit. HUD regulations and HAPGC Policy specifically permit the granting of an extra bedroom as a reasonable accommodation to a disability when there is medical equipment.

127.     On or about April 13, 2016, Mr. Phillips was shown the apartment. The unit offered to Mr. Phillips was another one-bedroom unit that lacked clear floor space at the toilet, and roll-in shower and grab bars could not be installed on the walls. Mr. Phillips did not wish to transfer to another inaccessible unit.

128.    Because HAPGC ignored Mr. Phillips' request to transfer to a UFAS accessible unit in August 2013, Mr. Phillips has been unable to use and enjoy his unit and must put himself at bodily risk to use basic amenities such as using the restroom and using the stove-top.

129.    This is a source of great frustration, anxiety, discomfort, and anger for Mr. Phillips. Additionally, it is a source of physical pain.  Mr. Phillips must pull his half-paralyzed body around a door frame. Mr. Phillips has fallen on numerous occasions because of the difficulty accessing his bathroom. Mr. Phillips has been told that he complains a lot by HAPGC staff.  Mr. Phillips' legitimate requests for physical accessibility have been dismissed by HAPGC staff and ignored.  Mr. Phillips continues to perform dangerous maneuvers and activities in his wheelchair in order to use the basic elements of his unit, including the bathroom. He has been denied full enjoyment and benefit of his housing unit because of his disabilities.

130.    Since the filing of the original complaint and Plaintiffs' Motion for Preliminary Injunctive Relief, Defendants have responded to Mr. Phillips request for a two-bedroom accessible unit.

<u>Alonzo Watts</u>

131.    Plaintiff Alonzo Watts has resided in public housing since 2013. Mr. Watts is a single-leg amputee and has diabetes. HAPGC first offered Mr. Watts a studio apartment that was not wheelchair accessible and did not have enough space for his in-home dialysis machine.  Mr. Watts was in the process of obtaining prosthetics and requested a unit that could accommodate his use of a wheelchair.  HAPGC represented that it would offer him a fully accessible unit.

132.    Mr. Watts uses his wheelchair in his home.  However, the unit lacks basic elements of accessibility, such as grab bars in the bathroom.  Mr. Watts must grab onto nearby items not intended to support his weight when he transfers to the toilet, including a towel rack, the wall,

and his bathroom sink.  Mr. Watts cannot rotate his wheelchair in the bathroom because of the lack of clear floor space in his bathroom. He can only transfer to the toilet by bracing himself against the wall and placing his full weight on his sink in order to lift himself from his chair onto the toilet.  Similarly, Mr. Watts cannot access his shower.  A concrete "lip" at the threshold of his "roll-in" shower prevents him from rolling into the shower. He is unable to rotate his chair to position himself parallel to his shower chair in order to transfer to his shower.  On or about January 5, 2016, Mr. Watts requested to be transferred to a UFAS unit and to have some modifications to his unit until such time as a UFAS unit becomes available.  After the filing of the original complaint and the Plaintiffs' Motion for Preliminary Injunctive Relief, several modifications were made to Mr. Watts' apartment to increase his safe use of his apartment.

133.    Because of the lack of physical accessibility in his bathroom, Mr. Watts places himself in physical danger daily because of the lack of grab bars in his restroom.  Mr. Watts is fearful of falling and not being able to receive help.  He places his body at risk daily by using items in his restroom not intended to support his weight.  Mr. Watts is disappointed that he is residing in a unit that is not wheelchair accessible.  Mr. Watts is frustrated and angered by the misrepresentations of HAPGC. Mr. Watts continues to use his wheelchair on a daily basis and transfers himself from his chair to the toilet without the benefit of grabbars in his unit.  He has been denied full enjoyment and benefit of his housing unit because of his disabilities.

<u>Kenneth Galloway</u>

134.    Plaintiff Kenneth Galloway is a double above-the-knee amputee.  He resides in a studio apartment in HAPGC public housing and uses a wheelchair for mobility.  His bathroom lacks clear floor space to allow him to transfer to his toilet and an appropriately accessible shower to allow him to access his shower.

135.    Mr. Galloway requested to be moved to an accessible unit in 2015 after his left leg was amputated. Instead, he was relocated to his current inaccessible unit by the HAPGC. Mr. Galloway asked for assistance from HAPGC in addressing the lack of accessibility of his unit. Mr. Galloway renewed his request in December 2015 for a UFAS accessible unit. He did not receive a response to that request.  After the filing of the original Complaint and Motion for Preliminary Injunction, Defendants offered Mr. Galloway a modified unit that adequately addressed his disability related needs and he transferred to that unit on December 5, 2016.

136.    At the time of filing the original Complaint, Mr. Galloway did not reside in an accessible unit.  His unit lacked clear floor space and appropriately placed grab bars in his bathroom to facilitate a safe transfer to the toilet. Mr. Galloway toileted in a bedside commode and then dispose of the contents into his toilet.  Additionally, because of the lack of accessibility in his shower from the absence of a shower bench and appropriate grab bars, Mr. Galloway bathed at his kitchen sink, or with a sponge in his bed. He was unable to maintain his hygiene to his satisfaction.

137.    The lack of accessibility was a source of depression and grave concern for Mr. Galloway. He experienced helplessness because he could not use the basic elements of his unit, such as the restroom.  When he used a bedside commode to toilet and a sponge to bathe, Mr. Galloway feels unable to care for himself and depressed.  Additionally, Mr. Galloway must use the community room to perform personal maintenance such as shaving and brushing his teeth.  He has been denied full enjoyment and benefit of his housing unit because of his disabilities.,

Gail Carson

138.    Plaintiff Gail Carson first moved into public housing from a nursing home in 2011.  At the time of her application, Ms. Carson requested a wheelchair-accessible unit.

139.    Despite this request, Ms. Carson was assigned an inaccessible housing unit by the HAPGC. Ms. Carson can drive her scooter forward into her bathroom.  She is unable to direct her scooter in any other direction. She can only face the wall opposite the entrance into the bathroom. Additionally, there are no grab bars or other assistive elements in her bathroom to assist her in transferring from her chair.  Because of the lack of accessibility features in her bathroom, Ms. Carson depends on the assistance of a second person to physically lift her up from her chair when they are in the bathroom.  This second person must stand in the shower and physically lift Ms. Carson and place her on the toilet. A similar routine is used for Ms. Carson to access her tub and shower.

140.    On several occasions she requested to have modifications to her bathroom completed so that her unit could be made accessible.  Ms. Carson even offered to use a budget from the Community First Choice program to help pay for modifications to her unit, but Defendants refused to permit her to even pay for modifications.

141.    In July 2014, Ms. Carson again requested assistance with the lack of accessibility in her unit at an HAPGC Board of Commissioners.

142.    In August 2014, HAPGC staff even visited Ms. Carson in her unit after one such request and observed that the unit was inaccessible and in apparent agreement with her, recommended that she be transferred to an existing accessible unit, aware that such a unit did not exist. However, Ms. Carson was only recently offered transfers in late June 2016 to units that lack accessibility features, including a unit that her power scooter could not reach because the route on which it was located was too steep.  Since the filing of the original Complaint and Plaintiffs' Motion for Preliminary Injunctive Relief, Defendants have responded to Ms. Carson's request for an accessible unit.

143.    Ms. Carson remains in an inaccessible unit. This is a source of anxiety, despair, physical

pain, and discomfort for Ms. Carson. While her doctors have suggested she get an electric

wheelchair, she has been hesitant to get one because of the lack of space in her apartment. Ms.

Carson can only safely utilize the bathroom in her unit when a second person is there to assist

her.  Further, being lifted by a second person while they stand in a tub causes anxiety about her

safety and causes her physical discomfort. She has been denied full enjoyment and benefit of her

housing unit because of her disabilities.

Sheila Smith

144.    Plaintiff  Sheila Smith is a resident of Cottage City Towers at 4142 Bunker Hill Rd., Apt.

208.  She first moved into HAPGC public housing in December 2013.

145.    On or about May 2016, Ms. Smith requested a transfer to a one-bedroom unit.  Ms. Smith

supplied the onsite property manager with a doctor's note explaining that Ms. Smith was

diagnosed with mental impairment and that she experienced discomfort in her studio apartment

and requested that Ms. Smith be transferred to a larger apartment.

146.    At the same time, Ms. Smith submitted verification that she had been prescribed an

electric wheelchair because of multiple musculoskeletal problems and verbally requested that she

be transferred to a wheelchair-accessible unit.

147.    Ms. Smith has foregone the purchase of the electric wheelchair until she is moved into an

accessible unit because her studio apartment does not provide adequate space or accessibility

features to allow her to use the wheelchair in the housing unit or enough storage space for her to

keep a wheelchair in her unit.

148.    Ms. Smith inquired to HAPGC's onsite property manager on three separate occasions

about the status of her reasonable accommodation request, but has received no response.  In June

34

2016, at an HAPGC Board of Commissioner's meeting, Ms. Smith spoke to Defendant Alvin

Coley about her request to transfer.  Mr. Coley told Ms. Smith that he was not the person to talk

to and he referred her again to the onsite property manager.

149.    Ms. Smith experiences anxiety in her studio apartment because of her disability. Her

anxiety has produced symptoms that can become overwhelming.  She has foregone the purchase

of an electric wheelchair until she is moved into an appropriately sized wheelchair-accessible

unit.  Consequently, she has fallen in her unit and experiences difficulty in using her unit and in

independently navigating outside of her unit.

Jacqueline White

150.    Plaintiff Jacqueline White is resident of Cottage City Towers at 4142 Bunker Hill Rd.,

Apt. 412.  She has been a resident since 1999.

151.    Ms. White is deaf.  Since moving into Cottage City Towers she has requested on

numerous occasions an interpreter to assist her in communicating with HAPGC staff.

152.    However, HAPGC staff will only agree to pass notes back and forth with Ms. White.

153.    Writing notes back and forth is not Ms. White's preferred means of communication and

she cannot fully express herself in writing.

154.    Ms. White has chronic maintenance issues in her unit but she is unable to have them

adequately addressed because of the lack of effective communication between herself and

HAPGC staff.

155.    When Ms. White goes to the front office to report these maintenance issues, the front

office will provide her with an interpreter and ask that she write her issue down.  Ms. White does

not write well and cannot fully convey herself via writing.

156.    Ms. White has routinely requested an interpreter from HAPGC to help her communicate her residency needs with HAPGC staff.  That request is routinely ignored or denied.

157.    Since around July 2015, the A/V features that alert Ms. White to someone at her door, or fire alarms, and other emergencies have been broken in her apartment.  She attempted on several times to put in a request and work order with the onsite manager, but the issues still have not been repaired.

158.    Additionally, Ms. White has attempted to apply numerous times for HAPGC's HCV program but has been unable to successfully communicate with HAPGC staff at the HCV program office.  She has requested an interpreter, but has never been provided that assistance.

159.    Ms. White feels isolated and frustrated by the practices of the Defendants, and her living conditions have suffered because of her inability to effectively communicate with the Defendants and their refusal to provide her with an effective means of communication with HAPGC staff.

LeKeisha Ellison

160.    Plaintiff LeKeisha Ellison is a mother of two young children both under the age of ten. She first moved into public housing in July 2013 at a townhouse in a HAPGC-owned property at Kimberley Gardens.  On or about May 2015, Ms. Ellison inquired about transferring to an appropriately sized unit on one level because of physical impairment that limits her ability to walk.

161.    The rooms in the townhouse in which Ms. Ellison resided could only be reached by climbing a flight of stairs, which caused her pain and discomfort because of her disability.

162.    On or about June 2015, Ms. Ellison submitted documentation to the onsite property manager from her doctors supporting her need for a transfer to a unit on one floor.

36

163.     In November 2015, Ms. Ellison was introduced to Alvin Coley.  Ms. Ellison raised her concerns about her request for a transfer and the lack of maintenance in her public housing unit.

164.     Mr. Coley stated he had not received her request for a transfer and Ms. Ellison again provided documentation regarding her request for a transfer to an appropriately sized unit on the first floor.

165.     When Ms. Ellison met with Mr. Coley again in December, 2015, Mr. Coley stated he could only offer her a voucher or a transfer to a larger unit with even more stairs.

166.     Ms. Ellison agreed to accept the voucher to attempt to locate an accessible unit.

167.     From December 2015 through March 2016, Ms. Ellison repeatedly attempted to contact either Mr. Coley or HAPGC staff working in the Housing Choice Voucher program about being issued a voucher.

168.      After months of waiting, Ms. Ellison finally received notice on or around April 1, 2016 from HAPGC about her eligibility for a voucher.

169.     Ms. Ellison requested that her public housing lease be terminated so that she could locate a unit with her voucher.

170.     However, since being issued a voucher Ellison has been unable to locate an appropriately-size unit with few or no steps that the Defendants will approve.  She has identified several units for which she is eligible for and for which she has requested approval of her tenancy to HAPGC.

171.     She first submitted a request for tenancy approval at a unit in June 2016, but she was unable to put together a security deposit in time and the landlord rented the unit to another tenant.  The security deposit at this unit was $1595, compared to the $200 security deposit Ms. Ellison had to put down for public housing.

172.     In August 2016, in anticipation of the coming school year and having her children in a permanent location in order to enroll them, Ms. Ellison submitted a request for a one-bedroom unit that had no or few steps.

173.     However, HAPGC refused to process this request on the grounds that the landlord was requesting too much rent for a one-bedroom unit – despite the considerable savings to HAPGC from Ms. Ellison renting a smaller unit than what she was entitled to and HAPGC having the ability to increase her payment standard up to 120% of the HUD set Fair Market Rent.

174.     In October 2016, Ms. Ellison submitted another request for tenant approval to HAPGC for a unit she had located.  After submitting the request, her housing specialist informed her that the rent for the unit was too high. When Ms. Ellison request an exception to the rent, her specialist again told her that this was something HAPGC could not do.

175.     Ms. Ellison has requested assistance from her HAPGC housing specialist in locating accessible housing but was told that HAPGC does not provide such assistance and that it is her obligation alone to locate a unit to use her voucher.  She has never been provided a listing of accessible housing units to which she could apply.

176.     Ms. Ellison and her two children have experienced increased housing instability, because they accepted a voucher only to find the HCV Program does not provide equal opportunity for benefits to families with disabilities and because they have not been able to identify an accessible rental housing unit that is acceptable to HAPGC.

177.     When Ms. Ellison accepted a voucher from HAPGC, she was not informed of the differences in potential costs and rights that are associated with the HCV Program as compared with the benefits for public housing residents.  Ms. Ellison did not anticipate the number of challenges and costs that would come with taking a voucher.  She is depressed about her lack of

housing and she experiences sleeplessness, fear, and anxiety, because of her currently unstable

housing situation.

Regina Lee

178.    Plaintiff Regina Lee is a 60-year-old participant in HAPGC's Housing Choice Voucher

Program.  She currently resides in Howard County, Maryland, with a HAPGC voucher under

HUD's portability rules.  Her desire is to live in Prince George's County, but she has been

unable to locate a wheelchair-accessible unit in Prince George's County with her voucher.

179.    Until 2015, Ms. Lee had resided in Prince George's County for most of her life.

180.    On or around 2005, Ms. Lee applied for HAPGC public housing and HCV Program.  She

indicated on her initial application that she required a wheelchair-accessible unit.

181.    HAPGC notified Ms. Lee that there was a unit available for her at Rolling Crest Village,

an HAPGC owned property.  The unit Ms.  Lee was shown was not wheelchair accessible –

HAPGC has no wheelchair-accessible units at Rolling Crest Village.

182.    Ms. Lee could not even go into the bathroom in the unit she was shown at Rolling Crest

Village.  There was inadequate space to store her three wheelchairs.  She rejected the unit

because of the lack accessibility and heard nothing more about a public housing unit from

HAPGC.

183.    Ms. Lee was left frustrated and confused by this offer because she had repeatedly

communicated to HAPGC her need for a wheelchair accessible unit.

184.    In September 2014, Ms. Lee was contacted by HAPGC staff about a voucher.  She

attended a voucher briefing.  The briefing session attended by Ms. Lee did not explain to Ms.

Lee, or other participants, their right to request reasonable accommodations, such as extensions

on time for vouchers, locating accessible housing units, or adjustments to payment standards.

185.     Ms. Lee was provided a listing of properties that accepted vouchers.  Over the course of

the next nine (9) months, Ms. Lee contacted the property listings provided by HAPGC and

discovered that many of the properties were not wheelchair accessible, or were not available to

rent.  Many of the properties Ms. Lee contacted from the list included steps to properties,

doorways that were too narrow, and had rents too high for Ms. Lee's voucher.

186.     Ms. Lee felt disappointment in not being able to locate an accessible unit in Prince

George's County and worried that she would lose her voucher.

187.     When Ms. Lee approached her HAPGC housing specialist about rent exceptions, her

housing specialist refused to offer any rental increase and instead asked the landlord to reduce

the amount of rent, which was refused by the landlord.

188.     On or about April 2015, Ms. Lee testified before the Prince George's County Council

about her struggle in locating accessible housing that would accept her voucher and that was

within the voucher's payment standard.

189.     The following month, after asking to speak with the HAPGC voucher program manager,

HAPGC staff approved Ms. Lee's voucher to be transferred over to the Howard County, where

she was able to locate accessible housing.

190.     However, since moving to Howard County, Ms. Lee has lost much of the independence

she had when residing in Prince George's County.  She has lost her social network and

community connections.  In Prince George's County, Ms. Lee was involved with her church,

volunteer organizations, and disability rights organizations.  Ms. Lee gave up some of her

volunteer activities because she has had to move to Howard County to locate accessible housing.

She desires to move back to Prince George's County and regain her lost independence.

<u>Dominic Radcliff</u>

Case 8:16-cv-03699-TDC   Document 23-2   Filed 12/16/16   Page 41 of 53

191.    Plaintiff Dominic Radcliff is a twenty-eight-year-old participant in HAPGC's HCV Program and a former HAPGC public housing resident.

192.    Mr. Radcliff has a physical disability that restricts the use of his joints and mobility.  He uses a wheelchair for mobility and has the assistance of his brother in completing daily activities.

193.    Mr. Radcliff applied to public housing in 2012. On his application, he indicated that he used a wheelchair.

194.    After moving to the top of the wait-list, HAPGC staff arranged an in home interview with Mr. Radcliff on or around December 17, 2013.

195.    At that meeting, Mr. Radcliff and his parents asked HAPGC staff about having a second person live with Mr. Radcliff to assist him in his activities of daily living.  HAPGC staff informed Mr. Radcliff and his family that this was not possible.  When they inquired about using a voucher so that Mr. Radcliff could have a live-in aide, HAPGC staff related that there were no vouchers administered in Prince George's County.  Mr. Radcliff was disappointed by this and was concerned about whether he could live in public housing.

196.    Mr. Radcliff was offered and leased a one-bedroom unit that was not wheelchair accessible.  He was never offered an accessible unit in HAPGC public housing.

197.    While residing in public housing, Mr. Radcliff fell on two separate occasions trying to utilize his unit.  The lack of accessibility and absence of a live-in aide to assist him significantly impaired his ability to utilize his unit.

198.    The manager at Cottage City Towers would complain to Mr. Radcliff about his brother coming by often to help him with his activities of daily living.  Mr. Radcliff felt like he had to do things on his own that he usually needed help with and felt that he had to conceal when he was requesting help from his family daily to assist him.

199.    On or about October 2014, Mr. Radcliff requested that his brother be added as a live-in aide and that he be transferred to a two-bedroom wheelchair-accessible unit.

200.    The Defendants were unable to provide Mr. Radcliff with a two-bedroom wheelchair-accessible unit and instead offered him a two-bedroom voucher.

201.    During his voucher briefing, Mr. Radcliff was given a list of apartment complexes that accepted vouchers.

202.    Mr. Radcliff looked for a unit that was accessible and close to his family so that he could be close to his support network.  However, Mr. Radcliff was unable to locate an accessible unit that would accept his voucher during the term of his voucher.

203.    Mr. Radcliff could only find a unit that was far from his family support network and that was not accessible.

204.    Mr. Radcliff's unit lacks an accessible route, and he can neither enter nor exit his apartment without physical assistance from someone else.  Additionally, he requires the assistance of his brother to even enter the bathroom in his unit.

205.    Mr. Radcliff would like to reside in an accessible unit that is closer to his family support network, but has been unable to find such a unit since receiving his voucher in 2013.

**Defendants Have Ignored Plaintiffs' Requests for Accessible Units and Reasonable Modifications to Public Housing Units and Fail to Follow its Own Internal Protocols Regarding Reasonable Accommodations**

206.    Defendants have failed to adequately respond to the Individual Plaintiffs' requests for reasonable accommodations.

207.     While Defendants maintain a reasonable accommodation policy, this reasonable accommodation policy has not been applied in the instance of the Plaintiffs.  Nor are there

obvious mechanisms to track and review requests for reasonable accommodations made in Defendants' housing programs. Upon information and belief, Defendants' standard operating procedure is to ignore their own internal policies relating to reasonable accommodation requests.

208.    For example, Defendants' policy requires that HAPGC staff log reasonable accommodation requests and respond within 30 (thirty) days of receipt of a request. Additionally, a denial of a request must be made in writing, but if HAPGC requires additional information it is incumbent upon HAPGC to request that information from the requesting party.

209.    Defendants do not follow their own administrative protocol and procedures in responding to reasonable accommodation requests.

210.    There is no appointed 504 coordinator to assist Defendants in following applicable law for persons with disabilities.

**Defendants Have Imposed Additional Terms and Conditions on Plaintiffs Through a Sponsorship Form because of their Disabilities**

211.    In addition to the suffering from the lack of accessibility in their housing and the Defendants' unwillingness to provide any accessibility features, Plaintiffs Ripley, Phillips, Carson, Galloway and Smith have also experienced unlawful disability discrimination and humiliation from HAPGC imposing additional terms and conditions on their residency in the form of a "sponsorship form."

212.    The "sponsorship form" is an agreement between HAPGC and a third party wherein the third party warrants to HAPGC:

> "[S]hould the leasee be unable to continue to maintain her/himself because of serious or chronic physical or mental health problems I agree to remove the leasee from the above premises and the make the individual my sole responsibility, and will not request further assistance from the Department until the leasee is able to resume full personal maintenance."

Case 8:16-cv-03599-TDC   Document 23-2   Filed 12/16/16   Page 44 of 53

As a condition of their occupancy, the Plaintiffs have been required to complete the sponsorship form and identify a "sponsor" or a third party who would agree to remove the Plaintiffs from their units.

213.    Ms. Ripley first moved into HAPGC public housing in 1988.  Upon moving in and as part of her initial certification to demonstrate her eligibility for public housing assistance, Ms. Ripley was given a packet to complete that required her to provide information such as  her income, Social Security number, and family size, and the "sponsorship form."  Ms. Ripley was told to complete and return all the forms in the packet.

214.    Each subsequent year, Ms. Ripley is given a new packet of information to complete as part of her recertification.  This includes items like her annual income, savings, and also a "sponsorship form."   Each year Ms. Ripley has had a friend or someone she knows complete the sponsorship form.  Ms. Ripley most recently completed a "sponsorship form" in 2014.

215.    Ms. Gail Carson first applied to HAPGC public housing in 2009 while she was still residing in a nursing facility. When Ms. Carson first applied for public housing she requested a wheelchair-accessible unit for herself.

216.    Beginning at Ms. Carson's initial certification for public housing and for all subsequent annual recertifications, a "sponsorship form" has been completed on behalf of Ms. Carson with her mother, Jeanette Carson, identified as the "sponsor."  This form had been completed without the knowledge or consent of Ms. Gail Carson.

217.    Mr. Kenneth Galloway first applied to public housing in 2002 and requested a wheelchair-accessible unit for himself as a family of one.  Mr. Galloway was given a packet of paper-work and told that it must be completed before he could move into public housing.

Among the forms included in this paper work was a 'sponsorship form.' Mr. Galloway had his brother, David Galloway, complete the form on his behalf.

218.    Mr. Andre Phillips first moved into public housing in 2010 with his then-wife.  At the time Mr. Phillips moved into public housing he was ambulatory.  Upon his initial move-in, Mr. Phillips was not required to complete a 'sponsorship form.'  Later that year in 2010, Mr. Phillips became paralyzed from the waist down.

219.    On or about August 2013, Mr. Phillips separated from his wife. In 2013, Mr. Phillips' annual recertification to public housing included a 'sponsorship form' completed by his daughter Ms. Erika Phillips.  Mr. Phillips' has never been provided a copy of this form as part of his annual recertification. He was not aware that his own daughter had been asked to complete this form and to control his tenancy in this manner.

220.    Ms. Sheila Smith first moved into public housing in 2013 and was required to complete a 'sponsorship form' upon her initial move-in.  She was required to complete the form again in 2014 after her annual recertification.

221.    This form is an illegal condition of tenancy and is a source of inconvenience, embarrassment and humiliation for the Individual Plaintiffs.

222.    On or around September 24, 2015, attorney for the Individual Plaintiffs sent a cease and desist letter to HAPGC requesting that HAPGC discontinue the practice of the 'sponsorship form.'

223.    Defendants sent a memo to its staff instructing that the practice should be discontinued and that any 'sponsorship form' should be voided by HAPGC staff.

224.    Upon information and belief, the form is not marked void in the file of Plaintiff Smith and other HAPGC residents who have the sponsorship form in their tenant file.

Case 8:16-cv-03899-TDC   Document 23-2   Filed 12/16/16   Page 46 of 53

**Disability Rights Maryland**

225.   DRM incorporates the allegations in paras. 1 thru 224 as germane to its constituents.

226.   DRM has made considerable effort in bringing the urgency of HAPGC's practices to the attention of the Defendants and encouraging them to change the operations of programs to create more access for persons with disabilities.

227.   DRM has submitted written comments since 2013 highlighting that Defendants should take immediate steps to address the lack of accessibility in its public housing program.

228.   As recent as April 15 2016, DRM urged HAPGC to develop a transition plan for its public housing portfolio and highlighted the apparent fact that HAPGC has failed to address the lack of accessibility in its housing protect

229.   DRM has attended, with its constituents, public meetings and hearings convened by HAPGC.  At those meetings DRM and its constituents have commented on the lack of accessibility in HAPGC's public housing programs and the difficulty of people with disabilities in utilizing their vouchers.

230.   DRM has encouraged HAPGC to administer a modification fund that is available to voucher holders with disabilities.

231.   DRM has objected to HAPGC practices that limit the ability of applicants to request reasonable accommodations in HAPGC's application process.

232.   DRM has objected to an on-line application that is not accessible for persons with visual impairments.

233.   DRM has encouraged HAPGC to utilize its project-based voucher authority to project-base vouchers at already existing accessible housing units and to expand the availability of accessible units in its voucher inventory.

Case 8:16-cv-03699-TDC   Document 23-2   Filed 12/16/16   Page 47 of 53

## COUNT I

### VIOLATIONS OF § 504 REHABILIATION ACT OF 1974, 24 U.S.C. § 794

234.    All prior paragraphs of this complaint are hereby incorporated by reference.

235,    The Defendants discriminated against the Plaintiffs within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, and its implementing regulations for HUD subsidized properties, 24 C.F.R. Part 8, by affording the Plaintiffs with housing, benefit, aid, and service that is unequal because of the lack of accessibility in the Defendants' public housing program and because Defendants fail to employ methods permitted by federal regulation that would allow Plaintiffs to reside in accessible housing units with Housing Choice Vouchers.

236.    The Defendants discriminated against the Plaintiffs within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, and its implementing regulations for HUD subsidized properties, 24 C.F.R. Part 8, by providing the Plaintiffs with housing, benefit, aid, and service that is not as effective in affording the Plaintiffs an equal opportunity because of the lack of accessibility in the Defendants public housing program and because Defendants fail to employ methods permitted by federal regulation that would allow Plaintiffs to reside in accessible housing units with Housing Choice Vouchers.

237.    The Defendants discriminated against the Plaintiffs within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, and its implementing regulations for HUD subsidized properties, 24 C.F.R. Part 8, by providing the Plaintiffs that applied for and requested accessible public housing with a separate housing aid, benefit or service in the form of a voucher that is *prima facie* different from public housing.

238.    The Defendants discriminated against the Plaintiffs within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, and its implementing regulations for HUD subsidized

properties, 24 C.F.R. Part 8, by offering vouchers in lieu of making modifications that comply with UFAS. The Defendants employ methods of administration that defeat or substantially impair the accomplishment of the public housing and HCV Program for qualified individuals with particular disabilities.

239.    The Defendants discriminated against the Plaintiffs within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, and its implementing regulations for HUD subsidized properties, 24 C.F.R. Part 8, by otherwise limiting people with disabilities from enjoying housing or the opportunity to obtain such housing by engaging in the policies, practices, acts, and omissions described above.

240.    The Defendants discriminated against the Plaintiffs within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, and its implementing regulations for HUD subsidized properties, 24 C.F.R. Part 8, by refusing to reasonably modify its policies, practices, procedures, and properties so that Plaintiffs could have equal access and opportunity to those properties.

241.    The Defendants discriminated against Plaintiffs Ripley, Phillips, Galloway, Carson, and Smith within the meaning of Section 504 of the Rehabilitation Act, 24 U.S.C. § 794, by requiring them to submit to an independent living requirement that imposes discriminatory terms and conditions on residents based on their disabilities.

242.    As a proximate result of Defendants' unlawful conduct, Individual Plaintiffs have been injured and seek relief as set forth herein and request compensatory damages from Defendant HAPGC in the amount of $200,000 to each Individual Plaintiff.

## COUNT II

### VIOLATION OF AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132

243.    All prior paragraphs of this complaint are hereby incorporated by reference.

244.    The Defendants discriminated against the Plaintiffs within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132, and its implementing regulations for HUD subsidized properties, 28 C.F.R. § 35 Subpart D, by affording the Plaintiffs with a benefit, aid, and service that is unequal because of the lack of accessibility in the Defendants' public housing program and because Defendants fail to employ methods permitted by federal regulation that would allow Plaintiffs to reside accessible housing units with Housing Choice Vouchers

245.    The Defendants discriminated against the Plaintiffs within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132 and its implementing regulations for HUD subsidized properties, 28 C.F.R. § 35 Subpart D, by providing the Plaintiffs with benefit, aid, and service that is not as effective in affording the Plaintiffs an equal opportunity because of the lack of accessibility in the Defendants' public housing program and because Defendants fail to employ methods permitted by federal regulation that would allow Plaintiffs to reside in accessible housing units with Housing Choice Vouchers

246.    The Defendants discriminated against the Plaintiffs within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132, and its implementing regulations for HUD subsidized properties, 28 C.F.R. § 35 Subpart D, by providing the Plaintiffs that applied for and requested accessible public housing with a separate housing aid, benefit or service in the form of a voucher that is *prima facie* different from public housing.

247.    The Defendants discriminated against the Plaintiffs within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132, and its implementing regulations for HUD subsidized properties, 28 C.F.R. § 35 Subpart D,  by offering vouchers in lieu of making modifications that comply with UFAS, the Defendants employ methods of administration that

49

defeat or substantially impair the accomplishment of the public housing and HCV Program for qualified individuals with particular disabilities.

248.     The Defendants discriminated against the Plaintiffs within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132, and its implementing regulations for HUD subsidized properties, 28 C.F.R. § 35 Subpart D, by otherwise limiting people with disabilities from enjoying housing or the opportunity to obtain such housing by engaging in the policies, practices, acts, and omissions described above.

249.     The Defendants discriminated against the Plaintiffs within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132, and its implementing regulations for HUD subsidized properties, 28 C.F.R. § 35 Subpart D  by failing to modify their policies, practices, procedures,  to afford Plaintiffs and other persons with disabilities equal access and opportunity to its housing programs.

250.     The Defendants discriminated against Plaintiffs Ripley, Phillips, Galloway, Carson, and Smith within the meaning of the Americans with Disabilities Act and Amendments, 42 U.S.C. § 12132, by requiring them to submit to an independent living requirement that imposes different terms and conditions on residents based on their disabilities.

251.     As a proximate result of Defendants' unlawful conduct, Individual Plaintiffs have been injured and seek relief as set forth herein and request compensatory damages from Defendant HAPGC in the amount of $200,000 to each Individual Plaintiff.


## COUNT III

**VIOLATION OF FAIR HOUSING ACT AMENDMENTS OF 1988, 42 U.S.C. 3604 *et seq*.**

252.     All prior paragraphs of this complaint are hereby incorporated by reference.

253.    The Defendants discriminated against the Plaintiffs within the meaning of the Fair

Housing Act Amendments by failing to respond to Plaintiffs' reasonable accommodation

requests. 42 U.S.C. § 3604f(3)(B).  Defendants Eric Brown and Alvin Coley have the obligation

to address reasonable accommodation and modification requests of persons with disabilities.

Defendants Eric Brown and Alvin Coley were aware of the Plaintiffs reasonable accommodation

requests but failed to ensure that their requests received a response in accordance with the law

and HAPGC policies.

254.    The Defendants discriminated against the Plaintiffs within the meaning of the Fair

Housing Act Amendments and its implementing regulations, 24 C.F.R. § 100.500,  by

implementing policies, practices, procedures and rules that have an adverse impact against

persons with disabilities by denying Plaintiffs and persons with disabilities equal access and

opportunity to Defendants' public housing and HCV Program.

255.    The Defendants discriminated against Plaintiffs Ripley, Phillips, Galloway, Carson, and

Smith within the meaning of the Fair Housing Act Amendments, by requiring them to submit to

an independent living requirement that imposes different terms and conditions on residents with

disabilities.  At all relevant times Defendants Eric Brown and Alvin Coley were aware of the use

of the 'sponsorship form.'

256.    The Defendants discriminated against the Plaintiffs by failing to affirmatively further fair

housing by refusing to address impediments to fair housing choice for Plaintiffs who lack equal

housing choice and opportunities.

257.    As a proximate result of Defendants' unlawful conduct, Individual Plaintiffs have been

injured and seek relief as set forth herein and request actual damages from Defendants HAPGC,

Brown, and Coley in the amount of $200,000 to each Individual Plaintiff, and punitive damages

from Defendants Brown and Coley in the amount of $15,000 to each Individual Plaintiff.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request the court:

A)      Issue a declaratory judgment declaring that Defendants' discriminatory actions, omissions, policies, and practices violate rights guaranteed to the Plaintiffs under the Fair Housing Act, the ADA, and the Rehabilitation Act;

C)      Issue a permanent injunction requiring that Defendants provide individuals with disabilities equal access to the benefits of the facilities, programs, services, and activities of housing programs administered by HAPGC;

D)      Order the Defendants to develop and implement a remedial plan, subject to approval by this Court, that ends the unlawful policies, practices, acts and omissions complained of herein, and to submit this plan to the court and to the attorneys for Plaintiffs for their review and approval;

E)      Retain jurisdiction over this action until implementation of this Court's decree has been completed;

F)      Award Plaintiffs' attorneys fees and costs of this proceeding, pursuant to 42 U.S.C. § 3613(c)(2), 29 U.S.C. § 794(b), and 42 U.S.C. § 12133;

G)       Order the Defendants to provide the Plaintiffs with their requested reasonable accommodation requests;

H)      Award damages to Individual Plaintiffs;

J)      Grant any other relief the Court may deem appropriate

Respectfully Submitted,

_____

52

/s/

_____

David A. Prater
Federal Bar Number: 30223
*Attorneys for Plaintiffs*
Disability Rights Maryland
1500 Union Ave.
Suite 2000
Baltimore, MD 21211
davidp@mdlclaw.org
p: 410-727-6352, ext. 2500
f: 410-727-6389

/s/

_____

Lauren Young
Federal Bar Number: 14364
*Attorneys for Plaintiffs*
Disability Rights Maryland
1500 Union Ave.
Suite 2000
Baltimore, MD 21211
laureny@disabilityrightsmd.org
p"410-727-6352, ext. 2498
f"410-727-6389

Date:   7/_27_/2016

Amended Complaint:  12/16/2016